## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| **MATTHEW S. REMSNYDER AND** **KIMBERLY I. MCMILLEN** 1711 Cannongate Road Forest Hill, MD 21050 | |
| **LUCY STRAUSBAUGH** 10 Mariner Walk Way Middle River, MD 21220 | |
| **VERNON AND CRYSTAL MILLER** 6908 Westchester Drive Temple Hills, MD 20748 | Civil Action No.: |
| **BONNIE S. VAUGHN** 730 Green Street Havre de Grace, MD 21078 | |
| **EDWARD AND KAREN LEECH, JR.** 8245 Stone Crop Drive, Unit H Ellicott City, MD 21043 | |
| **ELLEN T. GEILING** 7413 Meadow View Circle Clarksville, MD 21029 | |
| **TED AND ANDREA DOEDERLEIN** 1701 New Hampton Lane Woodstock, MD 21163 | |
| **RANDALL TAYLOR** 424 Enfield Road Joppa, MD 21085 | |
| **EDWARD F. AND ANNA M. BARTH, JR.** 1055 Doyle Road Street, MD 21085 | |
| *Plaintiffs*, | |
| v. | |
| **MBA MORTGAGE SERVICES, INC.** 426 South Main Street | |

Bel Air, MD 21015
<u>Serve on:</u> Michael P. Betley
403 Viola Court
Bel Air, MD 21015

*Defendant.*

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Matthew S. Remsnyder and Kimberly I. McMillen, Lucy Strausbaugh, Vernon and Crystal Miller, Bonnie S. Vaughn, Edward and Karen Leech, Jr., Ellen T. Geiling, Ted and Andrea Doederlein, Randall Taylor, and Edward F. and Anna M. Barth, Jr. on behalf of themselves and on behalf of the entire class of persons similarly situated, by and through their attorneys, Michael Paul Smith, Melissa L. English and Sarah A. Zadrozny of Smith, Gildea & Schmidt, LLC and Timothy F. Maloney, Veronica B. Nannis and Megan Benevento of Joseph, Greenwald and Laake, P.A., file this Class Action Complaint, sue the Defendant for cause, claim damages, and state as follows:

## INTRODUCTION

1.    Plaintiffs Matthew S. Remsnyder and Kimberly I. McMillen ("Remsnyder Plaintiffs"), Lucy Strausbaugh ("Strausbaugh"), Vernon and Crystal Miller ("Miller"), Bonnie S. Vaughn ("Vaughn"), Edward and Karen Leech, Jr. ("Leech Plaintiffs"), Ellen T. Geiling ("Geiling"), Ted and Andrea Doederlein ("Doederlein Plaintiffs"), Randall Taylor ("Taylor"), and Edward F. and Anna M. Barth, Jr. ("Barth Plaintiffs") (collectively, "Plaintiffs") and alleged Class Members are borrowers who currently have or had a residential mortgage loan originated and/or brokered by MBA Mortgage Services, Inc. ("MBA"), which was or is secured by Plaintiffs' and Class Members' residential real property.

2

2.  Plaintiffs and alleged Class Members are victims of an illegal kickback and price fixing scheme between MBA and All Star Title, Inc. ("All Star"), a Maryland-based title and settlement services company.

3.  Under the scheme, MBA's president, branch managers, loan officers, agents, and/or other employees received and accepted illegal kickbacks in exchange for the assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601, *et seq.*  MBA and All Star laundered the kickbacks through third party marketing companies to conceal the illegal kickbacks and the kickback agreement.

4.  As an essential component of the scheme, All Star conspired to and formed a cartel with various residential mortgage lenders ("All Star Lender Cartel"). MBA participated in the All Star Lender Cartel and, in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, entered into naked price fixing, minimum pricing and refusal to deal agreements (collectively, the "Cartel Agreements") with All Star related to the residential mortgage loans generated by All Star's illegal kickback payments to MBA.

5.  MBA benefitted, and upon information and belief, continues to benefit from the Cartel Agreements, because the supracompetitive prices for title and settlement services charged to MBA borrowers under the Cartel Agreements were financed into the borrower's loans, and which MBA charges and earns interest from these supracompetitive prices.

6.  MBA and All Star continuously and regularly used the U.S. Mail and interstate wires in furtherance of the kickback and price fixing scheme, and to identify and defraud borrowers into the All Star Scheme, willfully and intentionally engaging in a pattern of

racketeering activity over a period of at least five years, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*

7.    The kickback and Cartel Agreements, and the resulting supracompetitive prices, were fraudulently concealed by MBA and All Star from Plaintiffs and alleged Class Members by: laundering kickbacks through third party marketing companies, creating sham invoice and payment records, fraudulent representations in marketing materials, false allocation of title and settlement fees and manipulation of the APR associated with MBA loans, and false and fraudulent representations and omissions in MBA borrowers' loan documents, and prevented borrowers, regulators and auditors from discovering the scheme or kickback and Cartel Agreements and the injuries to MBA borrowers therefrom, thereby allowing the kickbacks and supracompetitive fees to continue.

## PARTIES

8.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

9.    Plaintiffs Matthew S. Remsnyder and Kimberly I. McMillen are residents of Harford County, Maryland.

10.    Plaintiff Lucy Strausbaugh is a resident of Baltimore County, Maryland.

11.    Plaintiffs Vernon and Crystal Miller are residents of Prince George's County, Maryland.

12.    Plaintiff Bonnie S. Vaughn is a resident of Harford County, Maryland.

13.    Plaintiffs Edward and Karen Leech, Jr. are residents of Howard County, Maryland.

14.    Plaintiff Ellen T. Geiling (formerly Weinman) is a resident of Howard County, Maryland.

15.    Plaintiffs Ted and Andrea Doederlein are residents of Howard County, Maryland.

16.    Plaintiff Randall Taylor is a resident of Harford County, Maryland.

17.    Plaintiffs Edward F. and Anna M. Barth are residents of Harford County, Maryland.

4

18.     Defendant MBA Mortgage Services, Inc. is a corporation organized under the laws of Maryland, with its headquarters and principal office located in Bel Air, Harford County, Maryland.  It is engaged in the business of consumer mortgage brokering and/or origination and/or lending and/or otherwise transacted business in the state of Maryland and in other states.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), Section 4 of the Sherman Act, 15 U.S.C. § 4, and 18 U.S.C. § 1964(c).

20.     This Court has personal jurisdiction over the parties.  Personal jurisdiction over MBA is appropriate because during the time period alleged herein MBA continuously transacted business within this District during the applicable time period and engaged in an illegal price fixing agreement to fix the prices charged by All Star for settlement services that was directed at, and had the intended effect of causing injury to, persons residing in or located in this District. In addition, MBA currently transacts business within this District.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because MBA is subject to personal jurisdiction in this District and a substantial part of the conduct, events, and omissions giving rise to Plaintiffs' and Class Members' claims occurred within this District, and a substantial portion of the affected interstate trade and commerce has been carried out in this District.

## FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

22.     At all relevant times, All Star Title, Inc. ("All Star") is a Maryland corporation and a title and settlement service provider licensed in Maryland and regulated by the Maryland Insurance Administration.  All Star is a licensed title and settlement service provider in

5

more than 30 states, and provides title and settlement services on residential mortgage loans, refinances and reverse mortgages secured by real property in 47 states.

I.    **The All Star Scheme**

      A.    **All Star and Participating Lenders Pay and Receive Kickbacks in Exchange for the Assignment and Referral of Residential Mortgage Loans to All Star and Employ Several Payment Forms and Channels to Conceal the Kickbacks from Borrowers, Regulators and Auditors**

23.    Beginning by at least 2008, All Star designs and executes a scheme ("All Star Scheme") to pay kickbacks to various mortgage lenders and their brokers, loan officers and other employees (collectively, "Participating Lender") in exchange for the Participating Lender's assignment and referral of residential mortgage loans, refinances and reverse mortgages to All Star for title and settlement services ("Kickback Agreement").

24.    All Star bases the amount of the kickback All Star paid on the number of loans the Participating Lender assigns and refers to All Star under the Kickback Agreement and the amount of profit All Star realizes on those loans.

25.    All Star pays, and Participating Lenders receive and accept, kickbacks in different forms and laundered by and through different channels.

26.    In some instances, All Star pays kickbacks by purchasing and delivering to a Participating Lender marketing materials for the Participating Lender to use in soliciting borrowers, most commonly postage to be used by a Participating Lender to send direct mail solicitations.

27.    In other instances, All Star pays cash kickbacks by checks written directly to a Participating Lender and/or their branch managers, mortgage brokers, loan officers, or other employees.  Often, a Participating Lender or its employee receives and accepts a

kickback check laundered by and through a sham entity set up for the express purpose of receiving and accepting kickbacks and concealing the same.

28.    In most instances, to further conceal the kickbacks, the Participating Lenders and All Star agree to have All Star not issue a check directly to the Participating Lender and/or their branch managers, mortgage brokers, loan officers, or other employees, but instead launders the kickback payment through a third party marketing company.

29.    Participating Lenders and/or their branch managers, mortgage brokers, loan officers, or other employees frequently use third party marketing companies (such as a direct mail, data and/or leads lists, telemarketing or live transfer leads provider) to provide marketing services aimed at soliciting borrowers to obtain residential mortgage loans, refinances and reverse mortgages, which increase the volume of loans the Participating Lender brokers or originates, thereby increasing its net profit and commissions earned.

30.    All Star and Participating Lenders use a variety of third party marketing companies to launder the kickbacks. Some of these marketing companies specialize in direct mail, while others specialize in producing data and leads lists of potential borrowers for direct mail or telemarketing solicitations.  Still other third party marketing companies provide Participating Lenders "live transfer" leads in which a borrower who contacts a centralized telemarketing company is transferred "live" to the Participating Lender.

31.    Under the Kickback Agreement, the Participating Lender receiving and accepting the kickback from All Star identifies a third party marketing company that the Participating Lender uses for marketing services.  The third party marketing company then produces an invoice for marketing services it produces for the Participating Lender that was subject to a kickback, All Star then makes the kickback payment to the third party marketing company, and the Participating Lender receives and accepts the kickback payment when

the third party marketing company applies the payment to the invoice for marketing services for the benefit of the Participating Lender.

32.     To even further conceal the kickbacks and the Kickback Agreement, All Star and the Participating Lenders request and cause the third party marketing companies to issue sham invoices that falsely identify All Star as the company purchasing and receiving the marketing services.   These sham invoices create the false impression that All Star purchases and receives marketing services when in fact the payment is a kickback received and accepted by the Participating Lender in exchange for the assignment and referral of loans to All Star under the Kickback Agreement.

33.     The sham invoices conceal the fact that any thing of value is exchanged between All Star and the Participating Lender related to the loans that are assigned and referred to All Star under the Kickback Agreement.

34.     In some instances, All Star and the Participating Lender direct the third party marketing company to create and/or receive sham split invoices, of which one invoice for a portion of the amount due to the third party marketing company is sent to the Participating Lender and one invoice for the other portion of the amount due to the third party marketing company is sent to All Star.

35.     All Star and the Participating Lenders' choice to use the split invoices create the false impression that All Star purchased and received marketing services when in fact the payment is a kickback received and accepted by the Participating Lender in exchange for the assignment and referral of loans to All Star under the Kickback Agreement.   The sham split invoices also hide All Star and the Participating Lender's coordinated business relationship because there is no Participating Lender listed on the sham split invoice received and paid by All Star.

8

36.     In other instances, All Star and the Participating Lenders choose to conceal the kickback payment entirely by creating sham payment records. To do this, a Participating Lender directs All Star to launder a kickback through the third party marketing company without the use or issuance of any invoice.  Other times, the Participating Lender forwards to All Star an invoice addressed to the Participating Lender and All Star launder a kickback through a third party marketing company by simply referencing the Participating Lender's invoice number.

37.     The choice to use sham payment records to conceal the fact that All Star is making a payment to the third party marketing company at all and creates the false record that payment of the invoice is being made by the Participating Lender, was an integral part of the Kickback Scheme and Agreement and design to hide the fact that payment is made by All Star.  The sham payment records and laundering the payoffs through marketing companies also conceal the fact that All Star and the Participating Lender exchanged a thing of value related to the loans that are assigned and referred to All Star under the Kickback Agreement.

**B.      All Star and Participating Lenders Form a Cartel and Conspire and Agree to Fix and Charge Borrowers Higher Prices for Title and Settlement Services and Refuse to Deal with Competitors**

38.     One of the purposes of the All Star Scheme is to allow All Star to charge borrowers higher prices for title and settlement service than is possible in a competitive market and to exclude other title and settlement services from the market for title and settlement services on residential mortgage loans, refinances and reverse mortgages.

39.     To achieve these purposes, All Star and Participating Lenders conspire to and form a cartel ("All Star Lender Cartel"), enter agreements and act in restraint of trade.

40.    To enforce the All Star Lender Cartel, All Star and Participating Lenders conspire to and agree to fix the prices All Star charges the Participating Lender's borrowers for title and settlement services on loans that are assigned and referred to All Star under the Kickback Agreement ("Price Fixing Agreement").

41.    In addition, All Star and the Participating Lenders conspire to and agree to minimum prices to charge borrowers for title and settlement services on loans that are assigned and referred to All Star under the Kickback Agreement ("Minimum Fee Agreements").

42.    The Price Fixing and Minimum Fee Agreements are enforced by an agreement that the Participating Lender refuse to deal with any other title and settlement services company on those loans generated by the kickbacks ("Refusal to Deal Agreement") (collectively, with the Price Fixing and Minimum Fee Agreements, the "Cartel Agreements"), such that all loans generated by the Kickback Agreement are referred to All Star and are subject to the Price Fixing and Minimum Fee Agreements.

43.    The prices All Star and the Participating Lenders fix under the Price Fixing and Minimum Fee Agreements are supracompetitive and higher than the prices that borrowers would otherwise be charged for title and settlement services in a competitive market and without the Cartel Agreements.

44.    An additional purpose of the All Star Lender Cartel formed by All Star and Participating Lenders under the Kickback and Cartel Agreements is to exclude All Star's competitors from the market for title and settlement services on residential mortgage loans, refinances and reverse mortgages, and to deprive borrowers of their choice of title and settlement service provider on loans generated by the All Star funded kickbacks.

45.    Participating Lenders benefit from the Cartel Agreements because: (i) the supracompetitive pricing funds the illegal kickbacks used by Participating Lenders to

solicit borrowers, generate residential mortgage loans, and earn substantial interest and commissions, and (ii) the costs for title and settlement service fees are financed into the loan and paid for by borrowers from loan proceeds such that the Participating Lender earned interest and other fees from the supracompetitive pricing.

### C.    All Star and the Participating Lenders Use the U. S. Mail and Interstate Wires to Identify and Lure Borrowers into the All Star Scheme

46.    All Star and Participating Lenders intend the All Star Scheme to defraud borrowers into paying supracompetitive prices for title and settlement services and to thereby fund and continue the kickbacks All Star is paying Participating Lenders.

47.    In service of this intention, Participating Lenders and All Star use the kickback payments to lure borrowers into the All Star Scheme, and in turn use the interstate mails and wires to identify, solicit and lure borrowers into the All Star Scheme.

48.    Potential borrowers are identified by the third party marketing companies through which All Star and Participating Lenders are laundering the kickbacks. Many of these third party marketing companies specialize in identifying and soliciting potential borrowers, and compiling and selling borrower sales and marketing "leads lists."

49.    Participating Lenders use these lists to solicit borrowers often through printed direct mail pieces such as postcards, letters, "SNAP packs", and other printed material that encourage borrowers to contact the Participating Lender and apply for a residential mortgage loan, refinance or reverse mortgage.

50.    All Star requires, and Participating Lenders agree, to include false representations in the Participating Lender's direct mail borrower solicitations, stating that a potential borrower would save "30-40% on title fees" by using All Star. The purpose of these false representations is to: (i) prevent a borrower from trying to use a different title and

settlement services company for the loan, (ii) conceal the fixed, supracompetitive pricing resulting from the All Star Scheme, and (iii) create the false representation that the prices charged the borrower for title and settlement services would be lower than the prices charged by All Star competitors.

51.    Participating Lenders and All Star, by and through third party marketing companies, cause borrower data and leads list to be merged onto these direct mail solicitations, and Participating Lenders, by and through the third party marketing companies, cause these fraudulent solicitations to be sent through the interstate U.S. mails.

52.    All Star and Participating Lenders also obtain from third party marketing companies borrower data and leads list to solicit borrowers over the telephone, and Participating Lenders use interstate wires to make these telemarketing calls to potential borrowers. Plaintiffs believe, and therefore aver, that All Star requires, and Participating Lenders agree, to make false representations to borrowers in these telephone solicitations similar to the false representations that All Star and Participating Lenders agree to include in direct mail solicitations.

53.    Participating Lenders also receive "live transfer" leads wherein a borrower calls a centralized call center, and then is transferred by the call center "live" to the Participating Lender. The third marketing company delivering the live transfer leads transmits the "live transfer" over interstate wires, and the Participating Lender receives the live transfer calls over interstate wires.

54.    All Star's records document that these borrower solicitation techniques lured thousands of borrowers into the All Star Scheme.

## II.    MBA's Participation in the All Star Scheme

55.    By at least July 2009, MBA, by and through its president, loan officers and other employees, agree to accept and receive kickbacks paid by All Star in exchange for the assignment and referral of MBA loans to All Star for title and settlement services, and assign and refer more than 750 loans to All Star involving residential mortgage loans, refinances or reverse mortgages secured by property in more than 8 states.

56.    All Star pays, and MBA receives and accepts, kickbacks that were laundered through third party marketing companies used by MBA for marketing services.

57.    At all relevant times, MBA's president and loan officers who received and accepted kickbacks are licensed mortgage brokers and/or authorized loan officers, and at all relevant times are acting within scope of the business relationship and duties of their employment on behalf of MBA, specifically seeking borrowers and originating and securing loans for residential mortgages through MBA and/or brokering such loans through MBA to other lenders with whom MBA authorizes, referring MBA borrowers to title companies, and working with title companies to close these loans.  All activities, including interaction with All Star, are for the benefit of MBA.

### A.    MBA Begins Participating in the All Star Scheme

58.    Beginning in July 2009, All Star begins paying kickbacks to MBA in exchange for assigning and referring MBA borrowers to All Star.

59.    From at least April 2009 through approximately November 2009, Rob Selznick was a loan officer employed by MBA at its Bel Air branch.  Beginning in at least July 2009 and at all times thereafter while Selznick was employed with MBA, and within the course and scope of that employment, All Star paid, and Selznick received and accepted pursuant to

the Kickback Agreement, kickbacks in exchange for the assignment and referrals of MBA loans, refinances and reverse mortgages from Selznick to All Star.

60.     On July 31, 2009, All Star pays a $4,380.00 kickback to Rob Selznick ("Selznick"), a MBA loan officer, laundered by and through Lendanear Data & Direct Mail Services, a Tennessee-based direct mail provider. The e-mails between Selznick and All Star and payment record appear as **Exhibits 1** and **2**.

61.     In or about November 2009, Selznick leaves employment at MBA and begins working for All Star as a Senior Account Manager.  Selznick uses this position to get MBA to enter the All Star Lender Cartel and Kickback Agreement.

**B.    MBA's President Directs Participation in the All Star Scheme and Oversees High Producing Loan Officers' Participation in the All Star Scheme**

62.     From May 2007 through the present, Michael Betley ("Betley") was and is currently the President of MBA.  In addition, Betley is a licensed mortgage loan originator.

63.     By approximately November 2009, MBA, by and through Betley, its president, begins conspiring with All Star to enter the All Star Lender Cartel and Kickback Agreement and to conceal the kickbacks and overcharges on borrowers' HUD-1s.  *See* Nov. 10, 2009 Betley e-mail with All Star, attached hereto as **Exhibit 3**.

64.     In furtherance and performance of the All Star Lender Cartel, MBA enters into naked price fixing agreements in which All Star and MBA conspire to and fix the prices charged borrowers for title and settlement services at supracompetitive levels and at levels higher than would have been charged without the price fixing agreements.

65.     In furtherance and performance of the All Star Lender Cartel, MBA also enters into minimum fee agreements in which All Star and MBA conspire to and fix minimum prices

to be charged to MBA borrowers for title and settlement services on loans assigned and referred by MBA to All Star under the Kickback Agreement.

66.    By the beginning of January 2010, All Star and MBA conspire to and agree to fix prices for title and settlement services associated with MBA loans referred to All Star by MBA to a "minimum of $1750 including insurance, but may be more depending on the loan." *See* Jan. 4, 2010 Title Fee Structure Sheet, attached hereto as **Exhibit 4**.

67.    At the same time, and at all times thereafter, and within the course and scope of his employment with MBA, All Star begins paying, and MBA, through Betley, its president, receives and accepts pursuant to the Kickback Agreement, kickbacks in exchange for the assignment and referral of MBA loans, refinances and reverse mortgages to All Star.

68.    Betley requires all of MBA's loan officers and employees to refer loans All Star for title and settlement services pursuant to the Kickback Agreement and Refusal to Deal Agreement under the Cartel Agreement.  This requirement is memorialized in an e-mail Betley sends to its employees, stating: "We have struck a deal with Allstar Title to offset some of the expenses for each of these [mailer] drops for January and February.  Since we have setup this relationship for the next two months ALL loans that are generated through in-house marketing or advertising MUST go to Allstar title" and that "[t]here are no exceptions".  *See* Jan. 15, 2010 e-mail from Betley, attached hereto as **Exhibit 5**.

69.    On January 26, 2010, All Star pays a $9,250.00 kickback to Betley and MBA laundered by and through Keary Advertising, a Maryland-based direct mail provider, for postage costs associated with four direct mail "drops" MBA was sending out in February 2010. The e-mails between Betley and All Star and associated invoices appear as **Exhibits 6** and **7**; *see also* **Exhibit 131**, 1/25/10 Marketing Campaign Loan Closings Spreadsheet.

70.    In addition to MBA, by and through its president Betley, receiving kickbacks for the benefit of MBA, some of MBA's highest-producing loan officers also receive kickbacks from All Star, which are authorized and acknowledged by MBA's president Betley and are also subject to the Kickback Agreement and All Star Cartel.

71.    Beginning in February 2010 through the present, Erin Lyles ("Lyles") was and is a loan officer employed by MBA.  At all times while Lyles was employed with MBA, and within the course and scope of that employment, All Star pays and Lyles receives and accepts pursuant to the Kickback Agreement, kickbacks in exchange for the assignment and referrals of MBA loans, refinances and reverse mortgages from Lyles, and MBA, to All Star.

72.    From October 2011 through June 2014, Jen Hoy ("Hoy") was a loan officer employed by MBA at its Bel Air branch.  At all times while Hoy was employed with MBA, and within the course and scope of that employment, All Star paid, and Hoy received and accepted pursuant to the Kickback Agreement, kickbacks in exchange for the assignment and referrals of MBA loans, refinances and reverse mortgages from Hoy to All Star.

73.    On March 2, 2010, All Star pays a $520.00 kickback to Lyles laundered by and through Lendanear Data & Direct Mail Services ("Lendanear"), a Tennessee-based data and direct mail provider.  The invoice and payment record associated with this kickback appear as **Exhibit 8**.

74.    The invoice states that Lendanear is providing data for 3,500 borrowers for use by Lyles in a solicitation mailer.  The data was sent to Lyles via e-mail communication; that is, through a wire.

75.   On March 17, 2010, All Star pays a $560.00 kickback to Lyles laundered by and through Lendanear. The invoice and payment record associated with this kickback appear as **Exhibit 9**.

76.   The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 3,500 potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

77.   On March 23, 2010, All Star pays a $400.00 kickback to Lyles laundered by and through Lendanear. The invoice and e-mail payment record associated with this kickback appear as **Exhibits 10** and **11**.

78.   The invoice states that Lendanear is providing data for 5,000 borrowers that Lyles would solicit in a mailer. The data was sent to Lyles via e-mail communication; that is, through a wire.

79.   On or about March 24, 2010, All Star and Lyles conspire and agree to raise the fixed prices for title and settlement services associated with MBA loans referred to All Star by Lyles from $1300 on all her loans, which were already "[o]bviously [] higher to offset the marketing", to "$1400 for FHA Streamlines, $1600 for VA Streamlines, and $2000 for Full Doc Loans" to account for the cost of the kickbacks paid to Lyles. *See* March 23-24, 2010 e-mails between Lyles and All Star, attached as **Exhibit 12**.

80.   The Price Fixing and Minimum Fee Agreements between All Star and MBA pursuant to the Kickback Agreement are separate from the Price Fixing Minimum Fee Agreements between All Star and Lyles because in addition to assigning and referring loans to All

17

Star that Lyles brokered and/or originated in response to the mail produced by MBA, Lyles is also assigning and referring loans that she brokers and/or originates in response to solicitations she sends out using the kickbacks paid specifically to her.

81.   On April 8, 2010, All Star pays a $400.00 kickback to Lyles laundered by and through Lendanear.  The invoice and payment record associated with this kickback appear as **Exhibit 13**.

82.   The invoice states that Lendanear is providing data for 5,000 borrowers that Lyles would solicit in her next mailer.  The data was sent to Lyles via e-mail communication; that is, through a wire.

83.   On April 9, 2010, All Star pays a $2,700.00 kickback to Lyles laundered by and through Jemco.  The invoice and e-mail associated with this kickback appears as **Exhibits 14** and **15**.

84.   The invoice states that Jemco prints and mails 5,000 MBA borrower solicitations (a "V Fold Pressure Seal mailer", otherwise known as a Snap Pack mailer) to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

85.   On April 22, 2010, All Star pays a $12,500.00 kickback to MBA laundered by and through Jemco Graphic Services, a Maryland-based direct mail provider, for 50,000 units of postage.  The invoice and e-mail payment record associated with this kickback appear as **Exhibits 16** and **17**; *see also* **Exhibit 131**, 1/25/10 Marketing Campaign Loan Closings Spreadsheet.

86.   On June 9, 2010, All Star pays a kickback to Lyles laundered by and through Tranzact Information Service ("Tranzact").   The e-mail record associated with this kickback appears as **Exhibit 18**.

87.   On July 9, 2010, All Star pays a $4,990.00 kickback to Lyles laundered by and through Jemco.   The invoice and e-mail record associated with this kickback appear as **Exhibits 19** and **20**.

88.   The invoice states that Jemco prints and mails 9,000 MBA borrower solicitations (a "V Fold Pressure Seal mailer", otherwise known as a Snap Pack mailer) to potential borrowers.   Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

89.   By August 2010, All Star and MBA, laundered by and through Betley, conspire and agree to fix prices for title and settlement services associated with MBA loans referred to All Star by MBA even higher, re-fixing prices charged to borrowers under the Price Fixing Agreement from a minimum of $1750 to a "minimum of $1850 including insurance, but may be more depending on the loan."   *See* Aug. 3, 2010 Title Fee Structure Chart and associated e-mail, attached as **Exhibits 21** and **22**.

90.   Also in August 2010, MBA and All Star further solidify their Kickback and Refusal to Deal Agreement. See August 9, 2010 letter from Betley to All Star, attached as **Exhibit 23**.

91.   In response to Betley's letter, All Star and MBA, by and through Betley, conspire and agree to fix prices for title and settlement services associated with MBA loans referred to All Star by MBA even higher and more specific, re-fixing process charged to borrowers

under the Price Fixing Agreement from $1850 for all loans to "$1850 on streamlines and $2400 on full docs." Betley acknowledges that these prices "make[] Allstar quite a 'pretty penny' on [] streamlines" and rise to "almost double what some title companies are charging". *See* Aug. 12, 2010 E-mail between Betley and All Star, attached as **Exhibit 24.**

92. On September 3, 2010, All Star pays a $3,120.00 kickback to Lyles laundered by and through Jemco. The invoice and e-mail payment record associated with this kickback appear as **Exhibits 25** and **26**.

93. The invoice states that Jemco prints and mails 6,000 MBA borrower solicitations (a "V Fold Pressure Seal mailer", otherwise known as a Snap Pack mailer) to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

94. On or about September 20, 2010, All Star pays a $5,053.10 kickback to MBA laundered by and through Jemco. The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 27** and **28**.

95. The invoice states that Jemco prints and mails 10,985 MBA borrower solicitations (a "V Fold Pressure Seal mailer", otherwise known as a Snap Pack mailer) to potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

96.    On or about September 20, 2010, All Star pays a $2,080.00 kickback to Lyles laundered by and through Jemco.  The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 29** and **30**.

97.    The invoice states that Jemco prints and mails 4,000 MBA borrower solicitations (a "V Fold Pressure Seal mailer", otherwise known as a Snap Pack mailer) to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

98.    By October 2010, All Star and Lyles conspire and agree to fix prices for title and settlement services even higher, re-fixing prices charged borrowers under the Price Fixing Agreement from $1400 for FHA Streamlines to "$1500 for FHA Streamlines" with the $1600 for VA Streamlines, and $2000 for Full Doc Loans remaining the same, to account for the cost of the kickbacks paid to Lyles.  *See* Oct. 1, 2010 Title Fee Structure Chart, attached as **Exhibit 31**.

99.    On October 8, 2010, All Star pays a $5,980.00 kickback to MBA laundered by and through Jemco.  The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 32 and 33**.

100.    The invoice states that Jemco prints and mails 13,000 MBA borrower solicitations (a "V Fold Pressure Seal mailer", otherwise known as a Snap Pack mailer) to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

101.    On October 19, 2010, All Star pays a $3,045.20 kickback to MBA laundered by and through Jemco.  The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 34** and **35**.

102.    The invoice states that Jemco prints and mails 6,620 MBA borrower solicitations (a "V Fold Pressure Seal mailer", otherwise known as a Snap Pack mailer) to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

103.    On November 5, 2010, All Star pays a $5,040.00 kickback to MBA laundered by and through Jemco.  The invoice and e-mail record associated with this kickback appear as **Exhibits 36** and **37.**

104.    The invoice states that Jemco prints and mails 10,500 MBA borrower solicitations (a "V Fold Pressure Seal mailer", otherwise known as a Snap Pack mailer) to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

105.    On November 5, 2010, All Star also pays a $3,008.64 kickback to Lyles also laundered by and through Jemco.  The invoice and e-mail payment record associated with this kickback appear as **Exhibits 38** and **39**.

106.    The invoice states that Jemco prints and mails 6,268 MBA borrower solicitations (a "V Fold Pressure Seal mailer", otherwise known as a Snap Pack mailer) to potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and

therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

107.  At the end of December 2010, All Star and MBA, by and through Betley, conspire and agree to fix prices for title and settlement services even higher, re-fixing prices charged to borrowers under the Price Fixing Agreement from $1850 on streamlines to $2000 for streamlines.  *See* Dec. 30, 2010 E-mail between Betley and All Star, attached as **Exhibit 40**.  This agreement is memorialized in All Star's January 13, 2011 Title Fee Structure Chart.  *See* Jan. 13, 2011 Chart, attached as **Exhibit 41**.

108.  As All Star states in the December 30, 2010 e-mail, the express purpose of these Price Fixing and Minimum Fee Agreements is because the "[a]verage fee per loan was $1227 after the cost of marketing which is about $300 per loan less than where we want to be. Jason is in for doing these campaigns, but I think we need to bump the fees a hair."  *See* **Exhibit 40**.

109.  On January 6, 2011, All Star pays a $1,483.69 kickback to Lyles laundered by and through Lendanear.  The invoice and payment record associated with this kickback appear as **Exhibit 42**.

110.  The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 3,001 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

111.    On January 7, 2011, All Star pays $440.00 kickback in stamps to Lyles.  The e-mail associated with this kickback appear as **Exhibit 43**.

112.    On February 3, 2011, All Star pays a $1,140.00 kickback to Lyles laundered by and through Lendanear.  The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 44** and **45**.

113.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 3,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

114.    On March 3, 2011, All Star pays a $1,236.00 kickback to Lyles laundered by and through Lendanear.  The invoice and payment record associated with this kickback appear as **Exhibit 46**.

115.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 2,500 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

116.    On March 2, 2011, All Star pays a $1,687.51 kickback to MBA laundered by and through Tranzact for data – specifically, names of 12,500 borrowers to solicit in its next direct mail piece.  The sham invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 47** and **48**.

117.   Then, on March 3, 2011, All Star pays a $6,180.00 kickback to MBA laundered by and through Lendanear.   The invoice and payment record associated with this kickback appear as **Exhibit 49**.

118.   The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 12,500 potential borrowers.   Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

119.   Combined with the data from Tranzact, All Star pays 100% of the 12,500 mailers MBA mails to solicit borrowers, which MBA will assign and refer to All Star for title and settlement services pursuant to the Kickback Agreement.

120.   On April 1, 2011, All Star pays a $3,167.62 kickback to MBA and Lyles laundered by and through Lendanear.   The invoice and payment record associated with this kickback appear as **Exhibit 50.**

121.   The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 6,407 potential borrowers.   Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

122.   At the end of April 2011, All Star and MBA, by and through Betley, conspire and agree to fix prices for title and settlement services charged to borrowers under the Price Fixing Agreement, re-fixing the prices back to $1850 including title for streamline loans and

keeping the price for full docs fixed at $2400.  *See* Apr. 25, 2011 E-mails between Betley and All Star, attached as **Exhibit 51**.  This agreement is memorialized in All Star's April 27, 2011 Title Fee Structure Chart.  *See* Apr. 27, 2011 Chart, attached as **Exhibit 52.**

123.    Betley states that he has "no problem 'juicing' these loans" in furtherance of the Cartel Agreements, and states that he is providing leads received by MBA from the kickbacks to Lyles.  *See* **Exhibit 51**.

124.    On May 6, 2011, All Star pays a $472.51 kickback to Lyles laundered by and through Tranzact.  The sham invoice and e-mail record regarding payment associated with this kickback appear as **Exhibit 53**.

125.    On May 6, 2011, All Star pays a $1,766.45 kickback to Lyles laundered by and through Lendanear.  The invoice and payment record associated with this kickback appear as **Exhibit 54**.

126.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 3,500 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

127.    On May 24, 2011, All Star pays a $337.51 kickback to MBA laundered by and through Tranzact for 5,000 leads.  The e-mail communications associated with this kickback appear as **Exhibit 55**.

128.    Then, on May 25, 2011, All Star pays a $1,261.75 kickback to MBA laundered by and through Lendanear.  The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 56** and **57**.

129.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 2,500 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

130.    On July 8, 2011, All Star pays a $4,500.00 kickback to MBA and Lyles laundered by and through Lendanear.  The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 58** and **59**.

131.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 11,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

132.    On August 3, 2011, All Star pays a $4,731.56 kickback to MBA laundered by and through Lendanear.  The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 60** and **61**.

133.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 9,375 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

134.    On September 8, 2011, All Star pays a $4,723.79 kickback to MBA laundered by and through Lendanear.  The invoice and payment record associated with this kickback appear as **Exhibit 62**.

135.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 9,360 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

136.    In September 2011, All Star and MBA, by and through Betley, conspire and agree to fix prices for title and settlement services charged to borrowers under the Price Fixing Agreement, re-fixing the prices to $1650 including title for streamlines and conventional loans and $1995 for "full docs, reverse and all other loans.  This applies to MBA loans referred by all loan officers to All Star.  *See* Sept. 12, 2011 Title Fee Structure Chart, attached as **Exhibit 63.**

137.    At the time of the Price Fixing Agreement with MBA, the lowest amount charged by All Star for settlement services in licensed states was $1,050.00 (including title insurance) under the Price Fixing Agreement with CBC National Bank.  *See* **Exhibit 63**.

138.    The difference between $1,050.00 and the amount charged to Plaintiffs under the Price Fixing and Minimum Fee Agreements is the minimum amount of the actual damages sustained by MBA borrowers assigned and referred by MBA and its loan officers in performance of the Cartel Agreements ("Kickback Overcharge").

139.  On October 4, 2011, All Star pays a $4,037.60 kickback to MBA laundered by and through Lendanear.  The invoice and payment record associated with this kickback appear as **Exhibit 64**.

140.  The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 8,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

141.  On October 11, 2011, All Star pays a $4,542.30 kickback to MBA laundered by and through Lendanear.  The invoice and sham payment record associated with this kickback appear as **Exhibit 65**.

142.  The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 9,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

143.  On November 4, 2011, All Star pays a $4,731.56 kickback to MBA laundered by and through Lendanear.  The invoice and sham payment record associated with this kickback appear as **Exhibit 66**.

144.  The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 9,375 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are

sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

145.    On November 23, 2011, All Star pays a $6,750.36 kickback to MBA laundered by and through Lendanear.   The invoice and payment record associated with this kickback appear as **Exhibit 67**.

146.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 13,375 potential borrowers.   Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

147.    On December 29, 2011, All Star pays a $4,731.57 kickback to MBA laundered by and through Lendanear.   The sham invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 68** and **69**.

148.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 9,375 potential borrowers.   Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

149.    On February 1, 2012, All Star pays a $6,450.57 kickback to MBA laundered by and through Lendanear.   The invoice and payment record associated with this kickback appear as **Exhibit 70**.

150.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 12,781 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

151.    On March 1, 2012, All Star pays a $6,501.86 kickback to MBA laundered by and through Lendanear.  The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 71** and **72**.

152.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 12,500 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

153.    On or about March 29, 2012, All Star pays a $6,501.86 kickback to MBA laundered by and through Lendanear.  The invoice and payment record associated with this kickback appear as **Exhibit 73**.

154.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 12,500 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

155.   On May 2, 2012, All Star pays a $6,501.86 kickback to MBA and Lyles laundered by and through Lendanear.  The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 74** and **75**.

156.   The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 12,500 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

157.   On or about May 7, 2012, All Star pays a $1,675.37 kickback to Lyles and Hoy laundered by and through Lendanear.  The invoice and e-mail records regarding payment associated with this kickback appear as **Exhibits 76** and **77**.

158.   The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 5,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

159.   On May 30, 2012, All Star pays a $6,501.86 kickback to MBA laundered by and through Lendanear.  The invoice and payment record associated with this kickback appear as **Exhibit 78**.

160.   The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 12,500 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are

sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

161.    In June 2012, All Star and MBA, by and through Betley, conspire and agree to fix prices for title and settlement services charged to borrowers under the Price Fixing Agreement to include additional fees for loans in which All Star does an application signing.   All Star and MBA fix the prices for loans requiring application signings to $1750, an increase of $100 than loans not requiring application signings ("Application Signing Surcharge").   *See* June 15, 2012 E-mail, attached as **Exhibit 79.**

162.    On July 2, 2012, All Star pays a $6,501.86 kickback to MBA laundered by and through Lendanear.   The invoice and payment record associated with this kickback appear as **Exhibits 80** and **81**.

163.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 12,500 potential borrowers.   Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

164.    On July 31, 2012, All Star pays a $6,501.86 kickback to MBA laundered by and through Lendanear.   The invoice and payment record associated with this kickback appear as **Exhibit 82**.

165.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 12,500 potential borrowers.   Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are

sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

166.    On or about August 10, 2012, All Star pays a $1,039.20 kickback to Hoy laundered by and through Lendanear.  The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 83** and **84**.

167.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 3,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

168.    On or about August 30, 2012, All Star pays a $6,501.86 kickback to MBA laundered by and through Lendanear.  The invoice and payment record associated with this kickback appear as **Exhibit 85**.

169.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 12,500 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

170.    On September 26, 2012, All Star pays a $6,501.86 kickback to MBA laundered by and through Lendanear.  The invoice and e-mail communication associated with this kickback appear as **Exhibits 86** and **87**.

171.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 12,500 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

172.    On or about October 23, 2012, All Star pays a $6,501.86 kickback to MBA laundered by and through Lendanear.  The invoice and payment record associated with this kickback appear as **Exhibit 88**.

173.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 12,500 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

174.    On November 13, 2012, All Star pays a $1,040.30 kickback to Lyles laundered by and through Lendanear.  The invoice and payment record associated with this kickback appear as **Exhibit 89**.

175.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 4,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

176.    In addition, All Star pays on or about November 13, 2012 a $1,000.00 kickback to Lyles in stamps. The e-mail associated with this kickback appears at **Exhibit 90**.

177.    On December 20, 2012, All Star pays a $5,461.58 kickback to MBA and Lyles laundered by and through Lendanear. The invoice and payment record associated with this kickback appear as **Exhibit 91**.

178.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 10,500 potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

179.    On or about January 10, 2013, All Star pays a $5,773.67 kickback to MBA laundered by and through Lendanear. The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 92** and **93**.

180.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 11,100 potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

181.    On February 12, 2013, All Star pays a $2,363.85 kickback to Lyles laundered by and through Lendanear. The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 94** and **95**.

182.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 4,500 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

183.    Also in February 2013, All Star and Lyles conspire and agree to fix prices for title and settlement services even higher, re-fixing prices charged borrowers under the Price Fixing Agreement to "$1750 on FHA streamlines and $1900 on everything else."  *See* Feb. 13, 2013 e-mail, attached as **Exhibit 96**.

184.    On February 12, 2013, Betley and All Star reiterate their Kickback Agreement and update their agreement as to the amount of kickback MBA would receive that corresponds to the volume of assignments and referrals of MBA borrowers to All Star, starting at $4,080 per month and increasing by tier depending on the number of loans assigned and referred to All Star.  *See* Feb. 12, 2013 e-mails, attached as **Exhibit 97**.

185.    In accordance with their agreement, on February 13, 2013, All Star pays a $4,202.40 kickback to MBA laundered by and through Lendanear.  The $4,202.40 payment accounts for the agreed-upon $4,080 kickback, plus a 3% credit card processing fee.  The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 98** and **99**.

186.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 8,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA

solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

187.    On or about February 19, 2013, All Star pays a $1,696.72 kickback to Hoy laundered by and through Lendanear.  The invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 100** and **101**.

188.    The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 3,230 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

189.    On March 5, 2013, All Star pays a $4,155.53 kickback to Lyles laundered by and through Influence Direct, a Tennessee-based direct mail provider.  The sham invoice and payment record associated with this kickback appear as **Exhibit 102**.

190.    The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 7,300 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

191.    On or about March 6, 2013, All Star pays a $4,202.40 kickback to MBA laundered by and through Lendanear.  The invoice and sham payment record associated with this kickback appear as **Exhibit 103**.

192.   The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 8,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

193.   On or about April 5, 2013, All Star pays a $4,150.40 kickback to MBA laundered by and through Lendanear.  The invoice and sham payment record associated with this kickback appear as **Exhibit 104**.

194.   The invoice states that Lendanear prints and mails MBA borrower solicitations (Snap Pack mailers) to 7,901 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

195.   On April 9, 2013, All Star pays a $1,707.75 kickback to Lyles laundered by and through Influence Direct.  The sham invoice and payment record associated with this kickback appear as **Exhibit 105**.

196.   The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 3,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

197.    On May 8, 2013, All Star pays a $4,149.60 kickback to MBA laundered by and through Influence Direct.  The invoice and sham payment record associated with this kickback appear as **Exhibit 106**.

198.    The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 7,280 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

199.    Also on May 8, 2013, All Star pays a $2,242.00 kickback to Lyles that is also laundered by and through Influence Direct.  The sham invoice and payment record associated with this kickback appear as **Exhibit 107**.

200.    The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 3,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

201.    On May 9, 2013, All Star pays a $1,140.00 kickback to Lyles laundered by and through Influence Direct.  The sham invoice and payment record associated with this kickback appear as **Exhibit 108**.

202.    The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 3,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations

are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

203.    On or about May 9, 2013, All Star also pays a $2,844.87 kickback to Hoy laundered by and through Influence Direct.  The sham invoice and payment record associated with this kickback appear as **Exhibit 109**.

204.    The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 4,991 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

205.    On May 31, 2013, All Star pays a $4,275.00 kickback to MBA laundered by and through Influence Direct.  The sham invoice and payment record associated with this kickback appear as **Exhibit 110**.

206.    The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 7,500 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

207.    On July 1, 2013, All Star pays a $4,199.76 kickback to MBA laundered by and through Influence Direct.  The invoice and sham payment record associated with this kickback appear as **Exhibit 111**.

41

208.    The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 7,368 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

209.    On or about July 9, 2013, All Star pays a $750.00 kickback to Lyles laundered by and through Azevedo Solutions Group, a California-based direct mail provider.  The invoice and sham payment record associated with this kickback appear as **Exhibit 112**.

210.    On July 11, 2013, All Star pays a $1,054.50 kickback to Lyles and Hoy laundered by and through Influence Direct.  The sham invoice and payment record associated with this kickback appear as **Exhibit 113**.

211.    The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 1,850 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

212.    On July 17, 2013, All Star pays a $1,023.55 kickback to Lyles and Hoy laundered by and through Influence Direct.  The sham invoice and e-mail record regarding record associated with this kickback appear as **Exhibits 114** and **115**.

213.    The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 1,861 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations

are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

214. On or about July 31, 2013, All Star pays a $600.00 kickback to Lyles and Hoy laundered by and through Azevedo. The invoice and e-mail record regarding record associated with this kickback appear as **Exhibits 116** and **117**.

215. On July 31, 2013, All Star pays a $4,199.75 kickback to MBA laundered by and through Influence Direct. The sham invoice and payment record associated with this kickback appear as **Exhibit 118**.

216. The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 7,368 potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

217. On August 30, 2013, All Star pays a $760.00 kickback to Hoy laundered by and through Best Rate Referrals, a Nevada-based direct mailing and marketing company, for live transfer calls. The sham invoice and payment record associated with this kickback appear at **Exhibit 119**.

218. According to the sham invoice, MBA is receiving more "Live Transfer" calls from Best Rate Referrals. Plaintiffs believe, and therefore aver, that the call center Best Rate Referrals uses to source these "live transfer" calls is not in Maryland, such that the "live transfer" calls are transmitted over interstate wires, with the live transfer call originating in one state, and being transferred to Hoy in a different state.

219.    On September 18, 2013, All Star pays a $4,149.60 kickback to MBA laundered by and through Influence Direct. The sham invoice and payment record associated with this kickback appear as **Exhibit 120**.

220.    The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 7,280 potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

221.    On or about October 30, 2013, All Star pays a $4,200.00 kickback to MBA laundered by and through Influence Direct. The sham invoice and e-mail communication associated with this kickback appear as **Exhibits 121** and **122**.

222.    The invoice states that Influence Direct prints and mails MBA borrower solicitations (Snap Pack mailers) to 7,500 potential borrowers. Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

223.    As of January 13, 2014, the prices fixed by All Star and MBA remain at $1650 including title for streamlines and conventional loans and $1995 for full docs, reverse and all other loans". In addition, MBA and All Star fix the price if an attorney was required to close the loan to an additional $450, and add a $150 Application Signing Surcharge for application signings completed by Brad, Rich and Blaise. In addition, All Star and MBA

re-fix the prices charged by Erin Lyles and Jen Hoy to "$1750.00 FHA, $1900.00 Others, and $1850.00 Atty". *See* Jan. 13, 2014 Title Fee Structure Chart, attached as **Exhibit 123**.

224.    On or about November 7, 2014, All Star pays a $800.00 kickback to Lyles laundered by and through Monster Lead Group ("Monster"), a Maryland-based leads and direct mail company.  The sham invoice and e-mail record regarding payment associated with this kickback appear as **Exhibits 124** and **125**.

225.    The invoice states that Monster processes, prints and mails MBA borrower solicitations to 1,000 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

226.    On or about November 21, 2014, All Star pays a $481.00 kickback to Lyles laundered by and through Monster.  The sham invoice and payment associated with this kickback appear as **Exhibit 126**.

227.    The invoice states that Monster processes, prints and mails MBA borrower solicitations to 550 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

228.    On February 18, 2015, All Star pays a $481.00 kickback to Lyles laundered by and through Monster.  The sham invoice associated with this kickback appear as **Exhibit 127**.

229.    The invoice states that Monster processes, prints and mails MBA borrower solicitations to 550 potential borrowers.  Based on the postage charged on the sham invoice, Plaintiffs believe and therefore aver that these MBA borrower solicitations are sent by U.S. Mail

and most, if not all, are delivered interstate; that is, the MBA solicitation is placed in the U.S. mail in one state and delivered to a borrower in a different state.

230.    The Price Fixing Agreement between All Star and MBA continues through at least 2015. On November 4, 2015, All Star and MBA conspire and agree to fix prices for title services associated with MBA loans referred to All Star to $1650 including title for loans closed in MD, VA, NC, FL, CO, FL, and DC, to $1850 including title and attorney fee for loans closed in DE and WV, and $395 and $195 for loans closed in PA, unless title insurance is over $1650, in which case All Star charges the borrower either just the title insurance or the equivalent of $1650.  See Nov. 4, 2015 Robs Client Fee Structure Chart, attached as **Exhibit 128**.

231.    Based on the continuing pattern of practice between All Star and MBA, Plaintiffs believe, and therefore aver, that All Star and MBA conspire to and fix prices for title and settlement services associated with loans assigned and referred to All Star by additional known and unknown MBA loan officers in furtherance and performance of the All Star Lender Cartel and the Cartel Agreements.

232.    Based on the continuing pattern of practice between All Star and MBA, Plaintiffs believe, and therefore aver, that All Star pays, and MBA receives, kickbacks in exchange for MBAs' assignment and referral of loans from additional known and unknown MBA loan officers in furtherance and performance of the Kickback Agreement, including but not limited to Gary Fischer, David Vach, Brad Hyson, and Andrew Tsottles.  *See, e.g.*, Jan. 26, 2010 e-mail about Gary Fischer mail and kickbacks, attached as **Exhibit 129**; Nov. 6, 2009 e-mail with Brad Hyson wanting cash kickbacks, attached as **Exhibit 130**.

233.    Based on the continuing pattern of practice between All Star and MBA, Plaintiffs believe, and therefore aver, that All Star pays kickbacks to MBA by and through other third party marketing companies in addition to those identified herein.

234.    Based on the continuing pattern of practice between All Star and MBA, Plaintiffs believe, and therefore aver, that All Star and MBA use and cause to be used U.S. mail and/or interstate wires to identify and solicit borrowers that are the currency of the Kickback and Cartel Agreements between All Star and MBA.

235.    As a result of the Kickback and Cartel Agreements, and MBA's participation in the All Star Lender Cartel and wider All Star Scheme, MBA borrowers, including Plaintiffs and alleged Class Members, are harmed because they are defrauded into being charged and paying higher and supracompetitive prices for title and settlement services than they would have been charged and paid without the Kickback and Cartel Agreements, are denied kickback free title and settlement services, and were denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

236.    No title services were provided by MBA, or any MBA employee and/or agent, associated with the receipt and acceptance of the kickbacks.  The payment by All Star and the receipt and acceptance by MBA of the kickbacks are made solely for the assignment and referral of MBA borrowers to All Star.

## FACTUAL ALLEGATIONS RELATED TO
## THE INDIVIDUAL CLASS REPRESENTATIVES

237.    Plaintiffs' transactions and the course of events thereafter exemplify the working of the Kickback and Cartel Agreements and are typical of all alleged Class Members' transactions.

A.    **The Remsnyder Plaintiffs' Loan**

238.    In or about July 2010, Plaintiffs Matthew S. Remsnyder and Kimberly I. McMillen ("Remsnyder Plaintiffs") obtained a residential mortgage loan from MBA through Andrew Tsottles, a loan officer employed by MBA, in relation to the refinancing of their residential real property and principal residence located at 348 Hunters Run Drive, Bel Air, MD 21015.  The Remsnyder Plaintiffs' loan settled on July 30, 2010 with MBA as the lender.

239.    The Remsnyder Plaintiffs believe, and therefore aver, that Andrew Tsottles assigned and referred the Remsnyder Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the $12,500.00 kickback All Star paid to and MBA received on April 16, 2010, laundered by and through Jemco, thereby performing the Kickback and Cartel Agreements, depriving the Remsnyder Plaintiffs of their choice of title and settlement service provider, and denying the Remsnyder Plaintiffs kickback-free title and settlement services.  A spreadsheet confirming the actual assignment and referral of the Remsnyder Plaintiffs' loan to All Star in furtherance of the All Star Scheme is attached as **Exhibit 131**.

240.    Consistent with the MBA's Price Fixing and Minimum Fee Agreements, All Star charged the Remsnyder Plaintiffs $1,850.00 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.  These title and settlement service fees included the $800.00 Kickback Overcharge described in ¶¶ 137-138, which is the minimum amount of the Remsnyder Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

241.  The Remsnyder Plaintiffs believe, and therefore aver, that they paid for these charges when All Star disbursed proceeds from the Remsnyder Plaintiffs' loan in payment of these title and settlement service charges.

242.  The Remsnyder Plaintiffs believe, and therefore after, that MBA benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to the Remsnyder Plaintiffs' loan because MBA financed the fees into their MBA loan and thereby earns interest on the fees.

243.  As a direct and proximate result of the Kickback and Cartel Agreements, and MBA's performance of these agreements, the Remsnyder Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

244.  As a direct and proximate result of the Kickback and Cartel Agreements, the Remsnyder Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $800.00 and, on information and belief, additional amounts.

    **B.    Lucy Strausbaugh's Loan**

245.  In or about June 2010, Plaintiff Lucy E. Strausbaugh ("Plaintiff Strausbaugh") obtained a residential mortgage loan from MBA through Stephanie Morton, a loan officer employed

by MBA, in relation to the refinancing of her residential real property and principal residence located at 10 Mariner Walk Way, Middle River, MD 21220.    Plaintiff Strausbaugh's loan settled on June 25, 2010 with MBA as the lender.

246.    Plaintiff Strausbaugh believes, and therefore avers, that Stephanie Morton assigned and referred Plaintiff Strausbaugh's loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the $12,500 kickback All Star paid to and received by MBA on April 16, 2010, laundered by and through Jemco, thereby performing the Kickback and Cartel Agreements, depriving Plaintiff Strausbaugh of her choice of title and settlement service provider, and denying Plaintiff Strausbaugh kickback-free title and settlement services.    A spreadsheet confirming the actual assignment and referral of Plaintiff Strausbaugh's loan to All Star in furtherance of the All Star Scheme is attached as **Exhibit 131**.

247.    Consistent with the MBA's Price Fixing and Minimum Fee Agreements, All Star charged Plaintiff Strausbaugh $1,843.25 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.    These title and settlement service fees included the $793.25 Kickback Overcharge described in described in ¶¶ 137-138, which is the minimum amount of Plaintiff Strausbaugh's actual damages resulting from the All Star Scheme and Cartel Agreements.

248.    Plaintiff Strausbaugh believes, and therefore avers, that she paid for these charges when All Star disbursed proceeds from Plaintiff Strausbaugh's loan in payment of these title and settlement service charges

249.    Plaintiff Strausbaugh believes, and therefore avers, that MBA benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to Plaintiff

Strausbaugh's loan because MBA financed the fees into her MBA loan and thereby earns interest on the fees.

250.    As a direct and proximate result of the Kickback and Cartel Agreements, and MBA's performance of these agreements, Plaintiff Strausbaugh was harmed because she was: (i) charged and paid more for settlement services than she would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of her choice of title and settlement service provider and her mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

251.    As a direct and proximate result of the Kickback and Cartel Agreements, Plaintiff Strausbaugh was charged and paid more for the title and settlement services than she would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $793.25 and, on information and belief, additional amounts.

**C.    The Miller Plaintiffs' Loan**

252.    In or about March 2012, Plaintiffs Vernon and Crystal Miller ("Miller Plaintiffs") obtained a residential mortgage loan from MBA through MBA Referring Broker Jen Hoy in relation to the refinancing of their residential real property and principal residence located at 6908 Westchester Drive, Temple Hills, MD 20748. The Miller Plaintiffs' loan settled on March 22, 2012 with MBA as the lender.

253.    The Miller Plaintiffs believe, and therefore aver, that Hoy assigned and referred the Miller Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as

quid pro quo for the kickback All Star paid to MBA on December 29, 2011, laundered by and through Lendanear, and/or the kickback All Star paid to MBA on February 1, 2012, laundered by and through Lendanear, thereby performing the Kickback and Cartel Agreements, depriving the Miller Plaintiffs of their choice of title and settlement service provider, and denying the Miller Plaintiffs kickback-free title and settlement services.

254.     Consistent with the MBA's Price Fixing and Minimum Fee Agreements, All Star charged the Miller Plaintiffs $1,650.00 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements. *See* Miller Plaintiffs' HUD-1, attached hereto as **Exhibit 132**; see also *See* Sept. 12, 2011 Title Fee Structure Chart, **Exhibit 63**.   These title and settlement service fees included the $600.00 Kickback Overcharge described in ¶¶ 137-138, which is the minimum amount of the Miller Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

255.     The Miller Plaintiffs paid for these charges when All Star disbursed proceeds from the Miller Plaintiffs' loan in payment of these title and settlement service charges as reflected on the Miller Plaintiffs' HUD-1. *See* **Exhibit 132**.

256.     The Miller Plaintiffs believe, and therefore aver, that MBA benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to the Miller Plaintiffs' loan because MBA financed the fees into their loan and thereby earns interest on the fees.

257.     As a direct and proximate result of the Kickback and Cartel Agreements, and MBA's performance of these agreements, the Miller Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their

choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

258.    As a direct and proximate result of the Kickback and Cartel Agreements, the Miller Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $600.00 and, on information and belief, additional amounts.

### D.    Bonnie Vaughn's Loan

259.    In or about August 2012, Plaintiff Bonnie S. Vaughn ("Plaintiff Vaughn") obtained a residential mortgage loan from MBA through MBA Referring Broker Erin Lyles in relation to the refinance of her residential real property and principal residence located at 730 Green Street, Havre de Grace, MD 21078.  Plaintiff Vaughn's loan settled on August 27, 2012 with MBA as the lender.

260.    Plaintiff Vaughn believes, and therefore avers, that Lyles assigned and referred Plaintiff Vaughn's loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the $1,675.37 kickback All Star paid to MBA on May 4, 2012, laundered by and through Lendanear, thereby performing the Kickback and Cartel Agreements, depriving Plaintiff Vaughn of her choice of title and settlement service provider, and denying Plaintiff Vaughn kickback-free title and settlement services.

261.    Consistent with the MBA's Price Fixing and Minimum Fee Agreements, All Star charged Plaintiff Vaughn $1,350.00 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.  *See* Plaintiff Vaughn's HUD-1, attached

as **Exhibit 133**.  These title and settlement service fees included the $300.00 Kickback Overcharge described in ¶¶ 137-138, which is the minimum amount of Plaintiff Vaughn's actual damages resulting from the All Star Scheme and Cartel Agreements.

262.   Plaintiff Vaughn paid for these charges when All Star disbursed proceeds from Plaintiff Vaughn's loan in payment of these title and settlement service charges as reflected on Plaintiff Vaughn's HUD-1. *See* **Exhibit 133**.

263.   MBA benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to Plaintiff Vaughn's loan because MBA financed the fees into her MBA loan and thereby earns interest on the fees.

264.   As a direct and proximate result of the Kickback and Cartel Agreements, and MBA's performance of these agreements, Plaintiff Vaughn was harmed because she was: (i) charged and paid more for settlement services than she would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of her choice of title and settlement service provider and her mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

265.   As a direct and proximate result of the Kickback and Cartel Agreements, Plaintiff Vaughn was charged and paid more for the title and settlement services than she would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $300.00 and, on information and belief, additional amounts.

   **E.**      **The Leech Plaintiffs' Loan**

266.    In or about December 2012, Plaintiffs Edward B. and Karen Leech, Jr. ("Leech Plaintiffs") obtained a residential mortgage loan from MBA through MBA Referring Broker Erin Lyles in relation to the refinancing of their residential real property and principal residence located at 8245 Stone Crop Drive, Unit H, Ellicott City, MD 21043. The Leech Plaintiffs' loan settled on December 31, 2012 with MBA as the lender.

267.    The Leech Plaintiffs believe, and therefore aver, that Lyles assigned and referred the Leech Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickback All Star paid to MBA on June 8, 2011, laundered by and through Influence Direct, thereby performing the Kickback and Cartel Agreements, depriving the Leech Plaintiffs of their choice of title and settlement service provider, and denying the Leech Plaintiffs kickback-free title and settlement services.

268.    Consistent with the MBA's Price Fixing and Minimum Fee Agreements, All Star charged the Leech Plaintiffs $1,550.00 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.  *See* Leech Plaintiffs' HUD-1, attached as **Exhibit 134**.  These title and settlement service fees included the $500.00 Kickback Overcharge described in ¶¶ 137-138, which is the minimum amount of the Leech Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

269.    The Leech Plaintiffs paid for these charges when All Star disbursed proceeds from the Leech Plaintiffs' loan in payment of these title and settlement service charges as reflected on the Leech Plaintiffs' HUD-1. *See* **Exhibit 134**.

270.    The Leech Plaintiffs believe, and therefore aver, that MBA benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to the

Leech Plaintiffs' loan because MBA financed the fees into their MBA loan and thereby earns interest on the fees.

271.    As a direct and proximate result of the Kickback and Cartel Agreements, and MBA's performance of these agreements, the Leech Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

272.    As a direct and proximate result of the Kickback and Cartel Agreements, the Leech Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $500.00 and, on information and belief, additional amounts.

    **F.    Ellen Geiling's Loan**

273.    In or about February 2011, Plaintiff Ellen T. Geiling (formerly Weinman) ("Plaintiff Geiling") obtained a residential mortgage loan from MBA through MBA Referring Broker Erin Lyles in relation to the refinancing of her residential real property and principal residence located at 7413 Meadow View Circle, Clarksville, MD 21029. Plaintiff Geiling's loan settled on February 28, 2011 with MBA as the lender.

274.    Plaintiff Geiling believes, and therefore avers, that Lyles assigned and referred Plaintiff Geiling's loan to All Star in performance of the Refusal to Deal Agreement and as quid

pro quo for the kickback All Star paid to and received by MBA and Lyles on November 5, 2010, laundered by and through Jemco, thereby performing the Kickback and Cartel Agreements, depriving Plaintiff Geiling of her choice of title and settlement service provider, and denying Plaintiff Geiling kickback-free title and settlement services.

275.  Consistent with the MBA's Price Fixing and Minimum Fee Agreements, All Star charged Plaintiff Geiling $2,020.00 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.  *See* Plaintiff Geiling's HUD-1, attached as **Exhibit 135**.  These title and settlement service fees included the $970.00 Kickback Overcharge described in ¶¶ 137-138, which is the minimum amount of Plaintiff Geiling's actual damages resulting from the All Star Scheme and Cartel Agreements.

276.  Plaintiff Geiling paid for these charges when All Star disbursed proceeds from Plaintiff Geiling's loan in payment of these title and settlement service charges as reflected on Plaintiff Geiling's HUD-1. *See* **Exhibit 135**.

277.  Plaintiff Geiling believes, and therefore avers, that MBA benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to Plaintiff Geiling's loan because MBA financed the fees into her MBA loan and thereby earns interest on the fees.

278.  As a direct and proximate result of the Kickback and Cartel Agreements, and MBA's performance of these agreements, Plaintiff Geiling was harmed because she was: (i) charged and paid more for settlement services than she would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of her choice of title and settlement service provider and her mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and

settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

279.    As a direct and proximate result of the Kickback and Cartel Agreements, Plaintiff Geiling was charged and paid more for the title and settlement services than she would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $970.00 and, on information and belief, additional amounts.

### G.    The Doederlein Plaintiffs' Loan

280.    In or about December 2011, Plaintiffs Ted and Andrea Doederlein ("Doederlein Plaintiffs") obtained a residential mortgage loan from MBA through David Vach and/or Richard Godfrey, loan officers employed by MBA, in relation to the refinancing of their residential real property and principal residence located at 1701 New Hampton Lane, Woodstock, MD 21163.  The Doederlein Plaintiffs' loan settled on December 21, 2011 with Freedom Mortgage as the lender.

281.    The Doederlein Plaintiffs believe, and therefore aver, that Vach assigned and referred the Doederlein Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickback All Star paid to MBA on October 4, 2011, laundered by and through Lendanear, thereby performing the Kickback and Cartel Agreements, depriving the Doederlein Plaintiffs of their choice of title and settlement service provider, and denying the Doederlein Plaintiffs kickback-free title and settlement services.

282.    Consistent with the MBA's Price Fixing and Minimum Fee Agreements, All Star charged the Doederlein Plaintiffs $1,650.00 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.  *See* Doederlein Plaintiffs' HUD-1, attached as **Exhibit 136**.  These title and settlement service fees included the $600.00 Kickback Overcharge described in ¶¶ 137-138, which is the minimum amount of

the Doederlein Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

283.   The Doederlein Plaintiffs paid for these charges when All Star disbursed proceeds from the Doederlein Plaintiffs' loan in payment of these title and settlement service charges as reflected on the Doederlein Plaintiffs' HUD-1. *See* **Exhibit 136**.

284.   MBA benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to the Doederlein Plaintiffs' loan because MBA financed the fees into their MBA loan and thereby earns interest on the fees.

285.   As a direct and proximate result of the Kickback and Cartel Agreements, and MBA's performance of these agreements, the Doederlein Plaintiffs was harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

286.   As a direct and proximate result of the Kickback and Cartel Agreements, the Doederlein Plaintiffs were charged and paid more for the title and settlement services than they would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $600.00 and, on information and belief, additional amounts.

H.    **Randall Taylor's Loan**

287.    In or about October 2015, Plaintiff Randall Taylor ("Plaintiff Taylor") obtained a residential mortgage loan from MBA through Richard Godfrey, a loan officer employed by MBA, in relation to the refinancing of his residential real property and principal residence located at 424 Enfield Road, Joppa, MD 21085.  Plaintiff Taylor's loan settled on October 8, 2015 with MBA as the lender.

288.    Plaintiff Taylor believes, and therefore avers, that Godfrey assigned and referred Plaintiff Taylor's loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickback All Star paid and continued to pay to MBA pursuant to the Kickback Agreement, thereby performing the Kickback and Cartel Agreements, depriving Plaintiff Taylor of his choice of title and settlement service provider, and denying Plaintiff Taylor kickback-free title and settlement services.  *See* **Exhibit 5**.

289.    Consistent with the MBA's Price Fixing and Minimum Fee Agreements, All Star charged Plaintiff Taylor $1,823.41 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements.  *See* Plaintiff Taylor's HUD-1, attached as **Exhibit 137**.  These title and settlement service fees included the $773.41 Kickback Overcharge described in ¶¶ 137-138, which is the minimum amount of Plaintiff Taylor's actual damages resulting from the All Star Scheme and Cartel Agreements.

290.    Plaintiff Taylor paid for these charges when All Star disbursed proceeds from Plaintiff Taylor's loan in payment of these title and settlement service charges as reflected on Plaintiff Taylor's HUD-1. *See* **Exhibit 137**.

291.    MBA benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to Plaintiff Taylor's loan because MBA financed the fees into his MBA loan and thereby earns interest on the fees.

292.  As a direct and proximate result of the Kickback and Cartel Agreements, and MBA's performance of these agreements, Plaintiff Taylor was harmed because he was: (i) charged and paid more for settlement services than he would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

293.  As a direct and proximate result of the Kickback and Cartel Agreements, Plaintiff Taylor was charged and paid more for the title and settlement services than he would have paid without the Kickback and Cartel Agreements, and suffered actual damages in the amount of at least $773.41 and, on information and belief, additional amounts.

**I.  The Barth Plaintiffs' Loan**

294.  In or about February 2015, Plaintiffs Edward F. and Anna M. Barth ("the Barth Plaintiffs") obtained a residential mortgage loan from MBA through Erin Lyles, a loan officer employed by MBA, in relation to the refinancing of their residential real property and principal residence located at 1055 Doyle Road, Street, MD 21154.  The Barth Plaintiffs' loan settled on February 20, 2015 with MBA as the lender.

295.  The Barth Plaintiffs believe, and therefore aver, that Lyles assigned and referred the Barth Plaintiffs' loan to All Star in performance of the Refusal to Deal Agreement and as quid pro quo for the kickback All Star paid to Lyles on either November 5, 2014 or November 21, 2014, laundered by and through Monster, thereby performing the Kickback and Cartel Agreements, depriving the Barth Plaintiffs of their choice of title

and settlement service provider, and denying the Barth Plaintiffs kickback-free title and settlement services.

296.    Consistent with the MBA's Price Fixing and Minimum Fee Agreements, the Barth Plaintiffs believe, and therefore aver, that All Star charged the Barth Plaintiffs $1,700.00 in total title and settlement service fees, thereby performing the Price Fixing and Minimum Fee Agreements. *See* Barth Plaintiffs' "Good" Faith Estimate, attached as **Exhibit 138**. These title and settlement service fees included the $650.00 Kickback Overcharge described in ¶¶ 137-138, which is the minimum amount of the Barth Plaintiffs' actual damages resulting from the All Star Scheme and Cartel Agreements.

297.    The Barth Plaintiffs believe, and therefore aver, that they paid for these charges when All Star disbursed proceeds from the Barth Plaintiffs' loan in payment of these title and settlement service charges.

298.    MBA benefitted, and continues to benefit, from the supracompetitive title and settlement service charges related to the Barth Plaintiffs' loan because MBA financed the fees into the Barth Plaintiffs' MBA loan and thereby earns interest on the fees.

299.    As a direct and proximate result of the Kickback and Cartel Agreements, and MBA's performance of these agreements, the Barth Plaintiffs were harmed because they were: (i) charged and paid more for settlement services than they would have paid without the illegal Kickback and Cartel Agreements; (ii) was defrauded into being charged and paying supracompetitive prices for title and settlements service fees; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

300.    As a direct and proximate result of the Kickback and Cartel Agreements, the Barth
        Plaintiffs were charged and paid more for the title and settlement services than they
        would have paid without the Kickback and Cartel Agreements, and suffered actual
        damages in the amount of at least $650.00 and, on information and belief, additional
        amounts.

### FACTUAL ALLEGATIONS RELATED TO LIMITATIONS

301.    Essential to the All Star Scheme, MBA, as well as other members of the All Star Lender
        Cartel, and All Star undertake affirmative acts that fraudulently conceal the Kickback and
        Cartel Agreements, the resulting kickbacks and fixed prices, and the actual injury and
        damages to borrowers, including Plaintiffs and alleged Class Members.

I.      **All Star and MBA Launder Kickbacks through Third Party Marketing
        Companies and Use Sham Invoice and Payment Records.**

302.    As described in ¶ 28 above, MBA and All Star chose to conceal the fact and payment of
        kickbacks by laundering kickbacks through third party marketing companies.

303.    As described in ¶¶ 32-36, MBA and All Star further chose to conceal the illegal
        kickbacks and Kickback Agreement through the creation of sham invoices and sham
        payment records.

304.    These sham invoices and payment records create an ongoing false record that conceals
        and prevents discovery of the fact that any thing of value was exchanged between MBA
        and All Star related to the assignment and referral of MBA loans, including Plaintiffs'
        loans, the actual payment and receipt and acceptance of illegal kickbacks, and MBA's
        coordinated business relationship with All Star.

II.     **MBA and All Star's Fraudulent Marketing Representations**

305.    To further conceal the Price Fixing, Minimum Fee Agreements, the Kickback

Agreement, and the resulting supracompetitive prices charged to MBA borrowers for title and settlement services, MBA and All Star made false representations to borrowers in marketing materials.

306.    In direct mail solicitations of borrowers, MBA represented that All Star had "competitive pricing", was a part of MBA's "experienced team of real estate professionals", and was "the number one choice of MBA Mortgage Services, Inc. clients." *See, e.g.*, MBA, Lyles and Hoy MBA Snap Pack mailers, attached as **Exhibits 139-140**.

307.    These representations are false because: (i)  MBA did not have an employment or ownership relationship with All Star; (ii)  a borrower could not save any percentage of title fees with All Star, but instead would be charged higher and supracompetitive fees under the Price Fixing and Minimum Fee Agreements; (iii) the reason the MBA broker was referring the borrower's loan to All Star was for the MBA broker to obtain kickbacks and to perform its obligations under the Cartel Agreements, not because the borrower would receive lower prices; and (iv) any borrower responding to the direct mail solicitation would not "choose" All Star, but would be assigned by MBA to  All Star and thereby required to use All Star.

308.    Plaintiffs believe, and therefore aver, that MBA made similar false representations by other means, e.g. as in telemarketing phone calls with borrowers.

###    III.    MBA and All Star's  False Allocation of Fees and APR Manipulation

309.    The Truth in Lending Act ("TILA") mandates that lenders report to borrowers the Annual Percentage Rate, or "APR", associated with a loan, refinance, or reverse mortgage. While the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes  both  the  interest  rate  of  the  loan  plus  certain  other  lender  fees,  such  as origination  fees,  discount  points  and  some  closing  costs,  including  some  title  and

settlement service fees.  The APR is intended as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates and to easily identify when one loan has substantially higher fees than another loan at the same interest rate.  Lenders are required to report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

310.   The title and settlement service fees that are excluded in the APR calculation are defined by TILA.  12 C.F.R. § 1026.4(c). Because some fees are excluded from the APR (and others are not), title and settlement service companies and lenders can manipulate – and falsely minimize – the APR by falsely allocating amounts charged for title and settlement services to those categories of fees that are excluded from the APR calculation.

311.   As a regular and continuing business practice, MBA and All Star allocated its charges for title and settlement services associated with a borrower's loan only to those categories of title services not included in the APR, thereby falsely minimizing the APR reported on MBA borrowers' loan documents and required federal disclosures.

312.   For example, "fees for title examination" and "abstract of title" are excluded from the APR calculation – see, 12 C.F.R. § 1026.4(c)(7)(i) – while a settlement or closing fee, or an application signing fee, is a settlement service cost required to be included in the APR calculation.  See 12 C.F.R. § 1026.4(a)(1)(i). By allocating the charges associated to conducting a settlement or closing with a borrower, or those charges associated with an application signing, to the category of "title exam" or "abstract" the result would be a false, and falsely minimized, APR.

313.   All Star claims the false allocation of fees and manipulation of the APR as a regular business practice as early as 2011 and at least through October, 2015, allocating all charges for title and settlement service to "Title Exam" or "Abstract" because those fees

are excluded from, and do not raise, the APR. *See, e.g.*, June 6, 2011 E-mail, attached as **Exhibit 141**; September 24, 2015 E-mail l, attached as **Exhibit 142**; October 6, 2015 E-mail, attached as **Exhibit 143**.

314.    MBA ratifies this false allocation of fees. *See* May 21, 2013 E-mail, attached as **Exhibit 144**. Based on this continuing pattern of practice, Plaintiffs believe, and therefore aver, that All Star and MBA engage in the false allocation and manipulation of the APR throughout the time period MBA is participating in the All Star Scheme.

315.    For example, despite conducting a settlement or closing with each MBA borrower, All Star and MBA choose to not allocate any amount of All Star's charges associated with a borrower's loan to "settlement or closing fee" because that charge is included in the APR. Instead, All Star and MBA allocate all charges, including that portion attributable to conducting a settlement or closing, to "Title Exam" or "Abstract", which are excluded from the APR. *See* **Exhibit 143**; *see* **Exhibit 144**.

316.    In addition, despite conducting application signings with borrowers, MBA and All Star choose to not allocate any amount of All Star's charges associated with a borrower's loan to an application signing.   Instead, All Star allocates all charges, including those attributable to conducting an application signing to "Title Exam" or "Abstract" because those fees are not included in and would not raise the APR.

317.    MBA and All Star's choice to falsely allocate fees resulted in the fraudulent reporting of false APR's and the false, and falsely minimized, representation of the cost of the loan to the MBA borrower.

318.    MBA and All Star's choice to falsely allocate fees and fraudulently report these false allocations in borrowers' loan documents concealed from MBA borrowers the supracompetitive pricing of title and settlement services resulting from the Kickback and

Cartel Agreements and prevented borrowers from discovering the supracompetitive nature of the pricing through comparison to MBA's and All Star's competitors.

319.   As a regular business practice, All Star used various software programs, including "TitleHound", to produce borrower loan documents, including documents reporting the APRs associated with a loan.  All Star caused this software, including TitleHound, to be programmed to make these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce MBA loan documents to present to borrowers and on which MBA and All Star intended borrowers rely. *See* Apr. 24-25, 2012 E-mails between All Star and TitleHound, attached as **Exhibit 145**.

320.   MBA and All Star's choice to falsely allocate fees and manipulate and falsely report APRs fraudulently concealed from MBA borrowers the coordinated business relationship between MBA and All Star under the Kickback and Cartel Agreements, the supracompetitive and higher prices for title and settlement services resulting from the Kickback and Cartel Agreements, and affirmatively prevented MBA borrowers from discovering their injuries resulting therefrom.

## IV.    False Representations in MBA Borrowers' Loan Documents

321.   In addition to false representations in marketing communications to borrowers and the choice to misrepresent the actual APR's through the intentionally classifying some of All Star's charges as non-APR related charges, MBA and All Star choose to make false representations on borrowers' loan documents.

322.   At all relevant times, federal law required MBA, as a lender, to provide a "Good Faith" Estimate to the borrower within three days of taking a loan application. 12 C.F.R. § 1024.7(a)-(b).

323.    Block 4 of the "Good Faith" Estimate is to state only the charges for "title services and lender's title insurance".

324.    As a regular pattern of practice, MBA falsely includes in Block 4 charges that are not title services and lender's title insurance including, the Kickback Overcharge (*see* ¶¶ 137-138), Application Signing Surcharge (*see* ¶¶ 161, 223), and other flat fee overcharges associated with the Price Fixing and Minimum Fee Agreements (*see* ¶¶ 223, 230).

325.    MBA's choice to falsely include these charges in Block 4 of the "Good Faith" Estimate conceals from borrowers: (i) the charges and amounts associated with the surcharges and flat fixed fees, (ii) the fixed and supracompetitive nature of the charges, (iii) the illegal kickbacks, and (iv) the coordinated business relationship between MBA and All Star under the Kickback and Cartel Agreements.

326.    In addition to the GFE, federal law, at all relevant times, required each borrower to receive a HUD- Settlement Statement at the closing or settlement of a loan.  The settlement agent produces the HUD-1, but federal regulations require the lender to provide to the settlement agent all information appearing in the HUD-1 statement.

327.    Section 1100 of the HUD-1 reports to the borrower the title and settlement services provided on the loan, along with the associated charges to the borrowers for those services.

328.    As a continuing pattern and regular business practice, MBA and All Star choose and cause the false allocation of fees described in ¶¶ 309-319, to repeat and appear on MBA borrowers' HUD-1 statements in Section 1100.

329.    As a continuing pattern  and regular business practice, MBA omits and fails to describe anywhere on a borrower's HUD-1 statement the amount of the  kickback received by MBA related to the borrower's loan or the fact that All Star has  paid a kickback to MBA

for the assignment and referral of the borrower's loan.  MBA is required to report the kickback on Line 801 or Line 808 of the HUD-1.

330.    As a continuing pattern of practice, MBA omits and fails to describe anywhere on a borrower's HUD-1 statement that the borrower is being charged or the amount of any Kickback or Application Signing Surcharge, or other flat fee associated with the fixed prices under the Cartel Agreements.  MBA is required to report these amounts in Section 1100 or Section 1300 of the HUD-1.

331.    These false representations and omissions, presented to MBA borrowers by All Star as MBA's agent at closing, fraudulently conceals: (i) the charges and amounts associated with the surcharges, overcharges, and flat fixed fees, (ii) the fixed and supracompetitive nature of the charges, (iii) the illegal kickbacks, and (iv) the coordinated business relationship between MBA and All Star under the Kickback and Cartel Agreements.

332.    Individually and collectively, MBA and All Star's  affirmative acts of concealment – the laundering of kickbacks through third party marketing companies, the related creation of shame invoice and payment records, false marketing statements, false allocation of fees and manipulation of the reported APR, and misrepresentations and omissions on borrowers "Good Faith" Estimates, HUD-1s, and other loan documents –are outside the control of MBA borrowers, including Plaintiffs and Class Members, and are in the sole control of, and the result of choices by, MBA and All Star.

### V.    Plaintiffs' Reasonable Diligence

333.    As a result of the fraudulent concealments by MBA and All Star, the Remsnyder Plaintiffs, Strausbaugh, the Miller Plaintiffs, Vaughn, Geiling, the Leech Plaintiffs, the Doederlein Plaintiffs, Taylor, and the Barth Plaintiffs (and, upon information and belief, all alleged Class Members) had no actual notice before, at or after the closing of their

MBA loans of the illegal kickbacks, the exchange of any thing of value between MBA and All Star, the Price Fixing and Minimum Fee Agreements or the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of MBA or All Star under the Kickback and Cartel Agreements.

334.    Plaintiffs exercised reasonable diligence before, during and after the closing of their loans.

### A.    The Remsnyder Plaintiffs' Reasonable Diligence

335.    As a result of the fraudulent concealments by MBA and All Star, the Remsnyder Plaintiffs have no actual notice before, at or after the closing of their MBA loan of the illegal kickbacks, the exchange of any thing of value between MBA and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of MBA or All Star under the Kickback and Cartel Agreements.

336.    The Remsnyder Plaintiffs exercise reasonable diligence before, during and after the closing of their loan.

337.    The Remsnyder Plaintiffs receive loan documents prepared by MBA in advance of their closing and review those loan documents.

338.    The Remsnyder Plaintiffs believe, and therefore aver, that their pre-closing loan documents include the Remsnyder Plaintiffs' "Good Faith" Estimate which they believe, and therefore aver, MBA prepared.  The Remsnyder Plaintiffs are not in possession of the "Good Faith" Estimate issued regarding their MBA refinance and believe that document is in the sole possession of MBA.

339.    The Remsnyder Plaintiffs believe, and therefore aver, that their "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star, or the fact that All Star has paid anything of value for MBA's assignment and referral of the Remsnyder Plaintiffs' loan to All Star.

340.    The Remsnyder Plaintiffs believe, and therefore aver, that their "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star contains the fraudulent representations and omission described in ¶¶ 322-325 above.  The Remsnyder Plaintiffs believe and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to the Remsnyder Plaintiffs' refinance.

341.    The Remsnyder Plaintiffs believe, and therefore aver, that their pre-closing documents reflect MBA and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 309-319.

342.    The false statements and omissions made in the Remsnyder Plaintiffs' pre-closing loan documents are made for the purposes of concealing, did so conceal from them, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Remsnyder Plaintiffs' loan, and the supracompetitive nature of prices the Remsnyder Plaintiffs were charged for title and settlement services.

343.    As is reasonable under the circumstances, the Remsnyder Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Remsnyder Plaintiffs do not believe, that: (i) a coordinated business relationship exists between MBA and All Star; (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the

assignment and referral of their MBA loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between MBA and All Star.

344.    The Remsnyder Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, MBA requires the Remsnyder Plaintiffs to participate in a closing, and they attend and fully participate in the required closing.

345.    The Remsnyder Plaintiffs believe, and therefore aver, that at the closing of their loan, they receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The Remsnyder Plaintiffs are not in possession of the documents received at their closing, including their HUD-1 issued regarding their MBA loan, and believe that document is in the sole possession of MBA.

346.    The Remsnyder Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, do not contain a description or statement of the coordinated business relationship between MBA and All Star under any of the Kickback or Cartel Agreements.

347.    The Remsnyder Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, do not contain a description or statement of any payment, amount or thing of value that was paid by All Star to MBA related to the Remsnyder Plaintiffs' loan.

348.    The Remsnyder Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, contain and reflect the false allocation of fees as described in ¶¶ 309-319.

349.    The Remsnyder Plaintiffs believe, and therefore aver, that the documents they received at their closing, including their HUD-1, contain the false representations and omissions described in ¶¶ 326-331.

350.    The false representations and omissions in the Remsnyder Plaintiffs' loan closing documents are made for the purposes of concealing, and did so conceal from them, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Remsnyder Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

351.    As is reasonable under the circumstances, the Remsnyder Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Remsnyder Plaintiffs do not believe, that: (i) a coordinated business relationship exists between MBA and All Star, (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of their MBA loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between MBA and All Star.

352.    The Remsnyder Plaintiffs act diligently after their closing.  On or about September 12, 2018, the Remsnyder Plaintiffs receive a letter from undersigned counsel describing the describing an investigation of All Star and MBA.  This is the Remsnyder Plaintiffs' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their MBA loan.

353.  Within days the Remsnyder Plaintiffs contact and retain counsel.  The Remsnyder Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

354.  As a result of MBA and All Star's fraudulent concealment, and the Remsnyder Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations on their claims were tolled beginning on the date of their loan closing and continuing until the Remsnyder Plaintiffs learning of facts giving rise to their causes of action, on or about September 12, 2018.

    **B.    Lucy Strausbaugh's Reasonable Diligence**

355.  As a result of the fraudulent concealments by MBA and All Star, Plaintiff Strausbaugh has no actual notice before, at or after the closing of her MBA loan of the illegal kickbacks, the exchange of any thing of value between MBA and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of MBA or All Star under the Kickback and Cartel Agreements.

356.  Plaintiff Strausbaugh exercises reasonable diligence before, during and after the closing of her loan.

357.  Plaintiff Strausbaugh receives loan documents prepared by MBA in advance of her closing and reviews those loan documents.

358.  Plaintiff Strausbaugh believes, and therefore avers, that her pre-closing loan documents include her "Good Faith" Estimate which she believes, and therefore avers, MBA prepared.  Plaintiff Strausbaugh is not in possession of the "Good Faith" Estimate issued regarding her MBA refinance and believes that document is in the sole possession of MBA.

359.    Plaintiff Strausbaugh believes, and therefore avers, that her "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star, or the fact that All Star has paid anything of value for MBA's assignment and referral of Plaintiff Strausbaugh's loan to All Star.

360.    Plaintiff Strausbaugh believes, and therefore avers, that her "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star contains the fraudulent representations and omission described in ¶¶ 320-325 above.  Plaintiff Strausbaugh believes and therefore avers that her "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to Plaintiff Strausbaugh's refinance.

361.    Plaintiff Strausbaugh believes, and therefore avers, that her pre-closing documents reflect MBA and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 309-319.

362.    The false statements and omissions made in Plaintiff Strausbaugh's pre-closing loan documents are made for the purposes of concealing, did so conceal from Plaintiff Strausbaugh, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Plaintiff Strausbaugh's loan, and the supracompetitive nature of prices Plaintiff Strausbaugh was charged for title and settlement services.

363.    As is reasonable under the circumstances, Plaintiff Strausbaugh believes these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Strausbaugh does not believe, that: (i) a coordinated business relationship exists between MBA and All Star; (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the

assignment and referral of her MBA loan for title and settlement services, or (iii) the prices she will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between MBA and All Star.

364.    Plaintiff Strausbaugh acts diligently during the closing or settlement of her loan.  As a condition of funding her loan, MBA requires Plaintiff Strausbaugh to participate in a closing, and she attends and fully participates in the required closing.

365.    Plaintiff Strausbaugh believes, and therefore avers, that at the closing of her loan, she receives from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  Plaintiff Strausbaugh is not in possession of the documents received at her closing, including her HUD-1 issued regarding their MBA loan, and believes that document is in the sole possession of MBA.

366.    Plaintiff Strausbaugh believes, and therefore avers, that the documents she receives at her closing, including her HUD-1, do not contain a description or statement of the coordinated business relationship between MBA and All Star under any of the Kickback or Cartel Agreements.

367.    Plaintiff Strausbaugh believes, and therefore avers, that the documents she receives at her closing, including her HUD-1, does not contain a description or statement of any payment, amount or thing of value that was paid by All Star to MBA related to Plaintiff Strausbaugh's loan.

368.    Plaintiff Strausbaugh believes, and therefore avers, that the documents she receives at her closing, including her HUD-1, contains and reflects the false allocation of fees as described in ¶¶ 309-319.

369.  Plaintiff Strausbaugh believes, and therefore avers, that the documents she received at her closing, including her HUD-1, contain the false representations and omissions described in ¶¶ 326-331.

370.  The false representations and omissions in Plaintiff Strausbaugh's loan closing documents are made for the purposes of concealing, and did so conceal from her, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff Strausbaugh's loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and her injuries and actual damages therefrom.

371.  As is reasonable under the circumstances, Plaintiff Strausbaugh believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Strausbaugh does not believe, that: (i) a coordinated business relationship exists between MBA and All Star, (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of her MBA loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between MBA and All Star.

372.  Plaintiff Strausbaugh acts diligently after her closing.  On or about September 12, 2018, Plaintiff Strausbaugh receives a letter from undersigned counsel describing the describing an investigation of All Star and MBA.  This is Plaintiff Strausbaugh's first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to her MBA loan.

373.    Within days Plaintiff Strausbaugh contacts and retains counsel.  Plaintiff Strausbaugh files this Complaint within months of becoming aware of facts giving rise to her causes of action, injuries, and actual damages.

374.    As a result of MBA and All Star's fraudulent concealment, and Plaintiff Strausbaugh's reasonable diligence before, during and after the closing of her loan, the statute of limitations on her claims were tolled beginning on the date of their loan closing and continuing until Plaintiff Strausbaugh's learning of facts giving rise to her causes of action, on or about September 12, 2018.

C.    **The Miller Plaintiffs' Reasonable Diligence**

375.    As a result of the fraudulent concealments by MBA and All Star, the Miller Plaintiffs have no actual notice before, at or after the closing of their MBA loan of the illegal kickbacks, the exchange of any thing of value between MBA and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of MBA or All Star under the Kickback and Cartel Agreements.

376.    The Miller Plaintiffs exercise reasonable diligence before, during and after the closing of their loan.

377.    The Miller Plaintiffs receive loan documents prepared by MBA in advance of their closing and review those loan documents.  The Miller Plaintiffs' pre-closing loan documents include their "Good Faith" Estimate which the Miller Plaintiffs believe, and therefore aver, MBA prepared.  The Miller Plaintiffs' "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star, or the fact that All Star has paid anything of value for MBA's

assignment and referral of the Miller Plaintiffs' loan to All Star. *See* **Exhibit 146**, Miller Plaintiffs' "Good Faith" Estimate.

378.   The Miller Plaintiffs' "Good Faith" Estimate contains the fraudulent representations and omission described in ¶¶ 322-325 above.

379.   The Miller Plaintiffs' pre-closing documents reflect MBA and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 309-319.

380.   The false statements and omissions made in the Miller Plaintiffs' pre-closing loan documents are made for the purposes of concealing, did so conceal from the Miller Plaintiffs, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Miller Plaintiffs' loan, and the supracompetitive nature of prices charged them for title and settlement services.

381.   As is reasonable under the circumstances, the Miller Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Miller Plaintiffs do not believe, that: (i) a coordinated business relationship exists between MBA and All Star; (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of the Miller Plaintiffs' MBA loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between MBA and All Star.

382.   The Miller Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, MBA requires Miller Plaintiffs to participate in a closing,

and Miller Plaintiffs attend and fully participate in the required closing, and review all documents with All Star's representative.

383.    At the closing of their loan, the Miller Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement. The Miller Plaintiffs review and sign all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

384.    The documents the Miller Plaintiffs receive at their closing, including their HUD-1, do not contain a description or statement of the coordinated business relationship between MBA and All Star under any of the Kickback or Cartel Agreements. *See* **Exhibit 132**, Miller Plaintiffs' HUD-1.

385.    The documents the Miller Plaintiffs receive at their closing, including their HUD-1, do not contain a description or statement of any payment, amount or thing of value that was paid by All Star to MBA related to Miller Plaintiffs' loan.

386.    The documents the Miller Plaintiffs receive at their closing, including their HUD-1, contain and reflect the false allocation of fees as described in ¶¶ 309-319.

387.    The documents the Miller Plaintiffs receive at their closing, including their HUD-1, contain the false representations and omissions described in ¶¶ 326-331.

388.    The false representations and omissions in the Miller Plaintiffs' loan closing documents are made for the purposes of concealing, and did so conceal from the Miller Plaintiffs, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Miller Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

389.    As is reasonable under the circumstances, the Miller Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Miller Plaintiffs do not believe, that: (i) a coordinated business relationship exists between MBA and All Star, (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of their loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between MBA and All Star.

390.    The Miller Plaintiffs act diligently after their closing.  On or about September 12, 2018, the Miller Plaintiffs receive a letter from undersigned counsel describing an investigation of All Star and MBA.  This is the Miller Plaintiffs' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their MBA loan.

391.    Within days the Miller Plaintiffs contact and retain counsel.  The Miller Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

392.    As a result of the MBAs and All Star's fraudulent concealment, and Miller Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations related to the Miller Plaintiffs' claims was tolled beginning on the date of their loan closing and continuing until the Miller Plaintiffs' learning of facts giving rise to their causes of action, on or about September 12, 2018.

**D.    Bonnie Vaughn's Reasonable Diligence**

393.    As a result of the fraudulent concealments by MBA and All Star, Plaintiff Vaughn has no actual notice before, at or after the closing of her MBA loan of the illegal kickbacks, the

exchange of any thing of value between MBA and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of MBA or All Star under the Kickback and Cartel Agreements.

394. Plaintiff Vaughn exercises reasonable diligence before, during and after the closing of her loan.

395. Plaintiff Vaughn receives loan documents prepared by MBA in advance of her closing and reviews those loan documents. Plaintiff Vaughn's pre-closing loan documents include her "Good Faith" Estimate which she believes, and therefore avers, MBA prepared. Plaintiff Vaughn's "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star, or the fact that All Star has paid anything of value for MBA's assignment and referral of Plaintiff Vaughn's loan to All Star. *See* **Exhibit 147**, Plaintiff Vaughn's "Good Faith" Estimate.

396. Plaintiff Vaughn's "Good Faith" Estimate contains the fraudulent representations and omission described in ¶¶ 322-325 above.

397. Plaintiff Vaughn's pre-closing documents reflect MBA and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 309-319.

398. The false statements and omissions made in Plaintiff Vaughn's pre-closing loan documents are made for the purposes of concealing, did so conceal from Plaintiff Vaughn, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Plaintiff Vaughn's loan, and the supracompetitive nature of prices charged them for title and settlement services.

399.   As is reasonable under the circumstances, Plaintiff Vaughn believes these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Vaughn does not believe, that: (i) a coordinated business relationship exists between MBA and All Star; (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of her MBA loan for title and settlement services, or (iii) the prices she will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between MBA and All Star.

400.   Plaintiff Vaughn acts diligently during the closing or settlement of her loan.  As a condition of funding her loan, MBA requires Plaintiff Vaughn to participate in a closing, and Plaintiff Vaughn attends and fully participates in the required closing, and reviews all documents with All Star's representative.

401.   At the closing of her loan, Plaintiff Vaughn receives from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  Plaintiff Vaughn reviews and signs all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

402.   The documents Plaintiff Vaughn receives at her closing, including her HUD-1, do not contain a description or statement of the coordinated business relationship between MBA and All Star under any of the Kickback or Cartel Agreements. *See* **Exhibit 133**, Plaintiff Vaughn's HUD-1.

403.   The documents Plaintiff Vaughn receives at her closing, including her HUD-1, do not contain a description or statement of any payment, amount or thing of value that was paid by All Star to MBA related to Plaintiff Vaughn's loan.

404.  The documents Plaintiff Vaughn receives at her closing, including her HUD-1, contain
and reflect the false allocation of fees as described in ¶¶ 309-319.

405.  The documents Plaintiff Vaughn receives at her closing, including her HUD-1, contain
the false representations and omissions described in ¶¶ 326-331.

406.  The false representations and omissions in Plaintiff Vaughn's loan closing documents are
made for the purposes of concealing, and did so conceal from Plaintiff Vaughn, the
coordinated business relationship between MBA and All Star, the Kickback and Cartel
Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff
Vaughn's loan, the fixed and supracompetitive nature of the prices charged for title and
settlement services, and her injuries and actual damages therefrom.

407.  As is reasonable under the circumstances, Plaintiff Vaughn believes these closing
documents and the representations made therein. A reasonable borrower would have no
reason to believe, and Plaintiff Vaughn does not believe, that: (i) a coordinated business
relationship exists between MBA and All Star, (ii) there has been any payment or
exchange of a thing of value between MBA and All Star related to the assignment and
referral of her loan for title and settlement services, or (iii) the prices charged for title and
settlement services are fixed and supracompetitive and the result of Kickback and Cartel
Agreements between MBA and All Star.

408.  Plaintiff Vaughn acts diligently after her closing.  On or about September 12, 2018,
Plaintiff Vaughn receives a letter from undersigned counsel describing an investigation of
All Star and MBA.  This is Plaintiff Vaughn's first indication of any potential wrongful,
illegal, potential harm and/or actionable conduct by anyone related to her MBA loan.

409.    Within days Plaintiff Vaughn contacts and retains counsel.  Plaintiff Vaughn files this Complaint within months of becoming aware of facts giving rise to her causes of action, injuries, and actual damages.

410.    As a result of the MBAs and All Star's fraudulent concealment, and Plaintiff Vaughn's reasonable diligence before, during and after the closing of her loan, the statute of limitations related to Plaintiff Vaughn's claims was tolled beginning on the date of her loan closing and continuing until Plaintiff Vaughn's learning of facts giving rise to her causes of action, on or about September 12, 2018.

### E.    The Leech Plaintiffs' Reasonable Diligence

411.    As a result of the fraudulent concealments by MBA and All Star, the Leech Plaintiffs have no actual notice before, at or after the closing of their MBA loan of the illegal kickbacks, the exchange of any thing of value between MBA and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of MBA or All Star under the Kickback and Cartel Agreements.

412.    The Leech Plaintiffs exercise reasonable diligence before, during and after the closing of their loan.

413.    The Leech Plaintiffs receive loan documents prepared by MBA in advance of their closing and reviews those loan documents.  The Leech Plaintiffs' pre-closing loan documents include their "Good Faith" Estimate which they believe, and therefore aver, MBA prepared.  The Leech Plaintiffs' "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star, or the fact that All Star has paid anything of value for MBA's assignment and

referral of the Leech Plaintiffs' loan to All Star. *See* **Exhibit 148**, Leech Plaintiffs' "Good Faith" Estimate.

414.    The Leech Plaintiffs' "Good Faith" Estimate contains the fraudulent representations and omission described in ¶¶ 322-325 above.

415.    The Leech Plaintiffs' pre-closing documents reflect MBA and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 309-319.

416.    The false statements and omissions made in the Leech Plaintiffs' pre-closing loan documents are made for the purposes of concealing, did so conceal from the Leech Plaintiffs, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Leech Plaintiffs' loan, and the supracompetitive nature of prices charged them for title and settlement services.

417.    As is reasonable under the circumstances, the Leech Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Leech Plaintiffs do not believe, that: (i) a coordinated business relationship exists between MBA and All Star; (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of their MBA loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between MBA and All Star.

418.    The Leech Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, MBA requires the Leech Plaintiffs to participate in a closing, and the Leech Plaintiffs attend and fully participate in the required closing, and review all documents with All Star's representative.

419.    At the closing of their loan, the Leech Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The Leech Plaintiffs review and sign all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

420.    The documents the Leech Plaintiffs receive at their closing, including their HUD-1, do not contain a description or statement of the coordinated business relationship between MBA and All Star under any of the Kickback or Cartel Agreements.  *See* **Exhibit 134**, Leech Plaintiffs' HUD-1.

421.    The documents the Leech Plaintiffs receive at their closing, including their HUD-1, do not contain a description or statement of any payment, amount or thing of value that was paid by All Star to MBA related to the Leech Plaintiffs' loan.

422.    The documents the Leech Plaintiffs receive at their closing, including their HUD-1, contain and reflect the false allocation of fees as described in ¶¶ 309-319.

423.    The documents the Leech Plaintiffs receive at their closing, including their HUD-1, contain the false representations and omissions described in ¶¶ 326-331.

424.    The false representations and omissions in the Leech Plaintiffs' loan closing documents are made for the purposes of concealing, and did so conceal from them, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Leech Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

425.    As is reasonable under the circumstances, the Leech Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Leech Plaintiffs do not believe, that: (i) a coordinated business

87

relationship exists between MBA and All Star, (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of their MBA loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between MBA and All Star.

426.    The Leech Plaintiffs acts diligently after their closing.  On or about September 12, 2018, the Leech Plaintiffs receive a letter from undersigned counsel describing the describing an investigation of All Star and MBA.  This is the Leech Plaintiffs' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their MBA loan.

427.    Within days the Leech Plaintiffs contacts and retains counsel.  The Leech Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

428.    As a result of MBA and All Star's fraudulent concealment, and the Leech Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations on her claims were tolled beginning on the date of their loan closing and continuing until the Leech Plaintiffs' learning of facts giving rise to their causes of action, on or about September 12, 2018.

            **F.    Ellen Geiling's Reasonable Diligence**

429.    As a result of the fraudulent concealments by MBA and All Star, Plaintiff Geiling has no actual notice before, at or after the closing of her MBA loan of the illegal kickbacks, the exchange of any thing of value between MBA and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged

for title and settlement services, or the coordinated business relationship of MBA or All Star under the Kickback and Cartel Agreements.

430.    Plaintiff Geiling exercises reasonable diligence before, during and after the closing of her loan.

431.    Plaintiff Geiling receives loan documents prepared by MBA in advance of her closing and reviews those loan documents.  Plaintiff Geiling's pre-closing loan documents include her "Good Faith" Estimate which she believes, and therefore avers, MBA prepared.  Plaintiff Geiling's "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star, or the fact that All Star has paid anything of value for MBA's assignment and referral of Plaintiff Geiling's loan to All Star. *See* **Exhibit 149**, Plaintiff Geiling's "Good Faith" Estimate.

432.    Plaintiff Geiling's "Good Faith" Estimate contains the fraudulent representations and omission described in ¶¶ 322-325 above.

433.    Plaintiff Geiling's pre-closing documents reflect MBA and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 309-319.

434.    The false statements and omissions made in Plaintiff Geiling's pre-closing loan documents are made for the purposes of concealing, did so conceal from Plaintiff Geiling, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Plaintiff Geiling's loan, and the supracompetitive nature of prices charged them for title and settlement services.

435.    As is reasonable under the circumstances, Plaintiff Geiling believes these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Geiling does not believe, that: (i) a coordinated business

relationship exists between MBA and All Star; (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of her MBA loan for title and settlement services, or (iii) the prices she will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between MBA and All Star.

436.    Plaintiff Geiling acts diligently during the closing or settlement of her loan.    As a condition of funding her loan, MBA requires Plaintiff Geiling to participate in a closing, and Plaintiff Geiling attends and fully participates in the required closing, and reviews all documents with All Star's representative.

437.    At the closing of her loan, Plaintiff Geiling receives from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.    Plaintiff Geiling reviews and signs all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

438.    The documents Plaintiff Geiling receives at her closing, including her HUD-1, do not contain a description or statement of the coordinated business relationship between MBA and All Star under any of the Kickback or Cartel Agreements. *See* **Exhibit 135**, Plaintiff Geiling's HUD-1.

439.    The documents Plaintiff Geiling receives at her closing, including her HUD-1, do not contain a description or statement of any payment, amount or thing of value that was paid by All Star to MBA related to Plaintiff Geiling's loan.

440.    The documents Plaintiff Geiling receives at her closing, including her HUD-1, contain and reflect the false allocation of fees as described in ¶¶ 309-319.

441.    The documents Plaintiff Geiling receives at her closing, including her HUD-1, contain the false representations and omissions described in ¶¶ 326-331.

442.     The false representations and omissions in Plaintiff Geiling's loan closing documents are made for the purposes of concealing, and did so conceal from Plaintiff Geiling, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff Geiling's loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and her injuries and actual damages therefrom.

443.     As is reasonable under the circumstances, Plaintiff Geiling believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Geiling does not believe, that: (i) a coordinated business relationship exists between MBA and All Star, (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of her loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between MBA and All Star.

444.     Plaintiff Geiling acts diligently after her closing.  On or about September 12, 2018, Plaintiff Geiling receives a letter from undersigned counsel describing an investigation of All Star and MBA.  This is Plaintiff Geiling's first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to her MBA loan.

445.     Within days Plaintiff Geiling contacts and retains counsel.  Plaintiff Geiling files this Complaint within months of becoming aware of facts giving rise to her causes of action, injuries, and actual damages.

446.     As a result of the MBAs and All Star's fraudulent concealment, and Plaintiff Geiling's reasonable diligence before, during and after the closing of her loan, the statute of limitations related to Plaintiff Geiling's claims was tolled beginning on the date of her

loan closing and continuing until Plaintiff Geiling's learning of facts giving rise to her causes of action, on or about September 12, 2018.

### G.    The Doederlein Plaintiffs' Reasonable Diligence

447.   As a result of the fraudulent concealments by MBA and All Star, the Doederlein Plaintiffs have no actual notice before, at or after the closing of their MBA loan of the illegal kickbacks, the exchange of any thing of value between MBA and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of MBA or All Star under the Kickback and Cartel Agreements.

448.   The Doederlein Plaintiffs exercise reasonable diligence before, during and after the closing of their loan.

449.   The Doederlein Plaintiffs receive loan documents prepared by MBA in advance of their closing and review those loan documents.

450.   The Doederlein Plaintiffs believe, and therefore aver, that her pre-closing loan documents include their "Good Faith" Estimate which they believe, and therefore aver, MBA prepared.  The Doederlein Plaintiffs are not in possession of the "Good Faith" Estimate issued regarding their MBA refinance and believe that document is in the sole possession of MBA.

451.   The Doederlein Plaintiffs believe, and therefore aver, that their "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star, or the fact that All Star has paid anything of value for MBA's assignment and referral of the Doederlein Plaintiffs' loan to All Star.

452.   The Doederlein Plaintiffs believe, and therefore aver, that their "Good Faith" Estimate does not include any description or statement of the coordinated business relationship

between MBA and All Star contains the fraudulent representations and omission described in ¶¶ 322-325 above. The Doederlein Plaintiffs believe and therefore aver that their "Good Faith" Estimate does not identify All Star as the provider of any title settlement service related to the Doederlein Plaintiffs' refinance.

453.    The Doederlein Plaintiffs believe, and therefore aver, that their pre-closing documents reflect MBA and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 309-319.

454.    The false statements and omissions made in the Doederlein Plaintiffs' pre-closing loan documents are made for the purposes of concealing, did so conceal from the Doederlein Plaintiffs, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Doederlein Plaintiffs' loan, and the supracompetitive nature of prices the Doederlein Plaintiffs were charged for title and settlement services.

455.    As is reasonable under the circumstances, the Doederlein Plaintiffs believe these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Doederlein Plaintiffs do not believe, that: (i) a coordinated business relationship exists between MBA and All Star; (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of their MBA loan for title and settlement services, or (iii) the prices she will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between MBA and All Star.

456.    The Doederlein Plaintiffs act diligently during the closing or settlement of their loan. As a condition of funding their loan, MBA requires the Doederlein Plaintiffs to participate in

a closing, and the Doederlein Plaintiffs attend and fully participate in the required closing, and review all documents with All Star's representative.

457.   At the closing of their loan, the Doederlein Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The Doederlein Plaintiffs review and sign all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

458.   The documents the Doederlein Plaintiffs receive at their closing, including their HUD-1, do not contain a description or statement of the coordinated business relationship between MBA and All Star under any of the Kickback or Cartel Agreements.  *See* **Exhibit 136**, Doederlein Plaintiffs' HUD-1.

459.   The documents the Doederlein Plaintiffs receive at their closing, including their HUD-1, do not contain a description or statement of any payment, amount or thing of value that was paid by All Star to MBA related to the Doederlein Plaintiffs' loan.

460.   The documents the Doederlein Plaintiffs receive at their closing, including their HUD-1, contains and reflects the false allocation of fees as described in ¶¶ 309-319.

461.   The Doederlein Plaintiffs believe, and therefore aver, that the documents they received at their closing, including their HUD-1, contain the false representations and omissions described in ¶¶ 326-331.

462.   The false representations and omissions in the Doederlein Plaintiffs' loan closing documents are made for the purposes of concealing, and did so conceal from them, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Doederlein Plaintiffs' loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

463.    As is reasonable under the circumstances, the Doederlein Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Doederlein Plaintiffs do not believe, that: (i) a coordinated business relationship exists between MBA and All Star, (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of their MBA loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between MBA and All Star.

464.    The Doederlein Plaintiffs acts diligently after their closing.  On or about September 12, 2018, the Doederlein Plaintiffs receive a letter from undersigned counsel describing the describing an investigation of All Star and MBA.  This is the Doederlein Plaintiffs' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their MBA loan.

465.    Within days the Doederlein Plaintiffs contacts and retains counsel.  The Doederlein Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

466.    As a result of MBA and All Star's fraudulent concealment, and the Doederlein Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations on her claims were tolled beginning on the date of their loan closing and continuing until the Doederlein Plaintiffs' learning of facts giving rise to their causes of action, on or about September 12, 2018.

    **H.    Randall Taylor's Reasonable Diligence**

467.    As a result of the fraudulent concealments by MBA and All Star, Plaintiff Taylor has no actual notice before, at or after the closing of his MBA loan of the illegal kickbacks, the

exchange of any thing of value between MBA and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of MBA or All Star under the Kickback and Cartel Agreements.

468.    Plaintiff Taylor exercises reasonable diligence before, during and after the closing of his loan.

469.    Plaintiff Taylor receives loan documents prepared by MBA in advance of his closing and reviews those loan documents.  Plaintiff Taylor's pre-closing loan documents include his "Good Faith" Estimate which he believes, and therefore avers, MBA prepared.  Plaintiff Taylor's "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star, or the fact that All Star has paid anything of value for MBA's assignment and referral of Plaintiff Taylor's loan to All Star.  *See* **Exhibit 150**, Plaintiff Taylor's "Good Faith" Estimate.

470.    Plaintiff Taylor's "Good Faith" Estimate contains the fraudulent representations and omission described in ¶¶ 322-325 above.

471.    Plaintiff Taylor's pre-closing documents reflect MBA and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 309-319.

472.    The false statements and omissions made in Plaintiff Taylor's pre-closing loan documents are made for the purposes of concealing, did so conceal from Plaintiff Taylor, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to Plaintiff Taylor's loan, and the supracompetitive nature of prices charged him for title and settlement services.

473.    As is reasonable under the circumstances, Plaintiff Taylor believes these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Plaintiff Taylor does not believe, that: (i) a coordinated business relationship exists between MBA and All Star; (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of his MBA loan for title and settlement services, or (iii) the prices he will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between MBA and All Star.

474.    Plaintiff Taylor acts diligently during the closing or settlement of his loan.  As a condition of funding his loan, MBA requires Plaintiff Taylor to participate in a closing, and Plaintiff Taylor attends and fully participates in the required closing, and reviews all documents with All Star's representative.

475.    At the closing of his loan, Plaintiff Taylor receives from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  Plaintiff Taylor reviews and signs all of the documents All Star presents at the closing, including the HUD-1 Settlement Statement.

476.    The documents Plaintiff Taylor receives at his closing, including his HUD-1, do not contain a description or statement of the coordinated business relationship between MBA and All Star under any of the Kickback or Cartel Agreements. *See* **Exhibit 137**, Plaintiff Taylor's HUD-1.

477.    The documents Plaintiff Taylor receives at his closing, including his HUD-1, do not contain a description or statement of any payment, amount or thing of value that was paid by All Star to MBA related to Plaintiff Taylor's loan.

478.   The documents Plaintiff Taylor receives at his closing, including his HUD-1, contain and reflect the false allocation of fees as described in ¶¶ 309-319.

479.   The documents Plaintiff Taylor receives at his closing, including his HUD-1, contain the false representations and omissions described in ¶¶ 326-331.

480.   The false representations and omissions in Plaintiff Taylor's loan closing documents are made for the purposes of concealing, and did so conceal from Plaintiff Taylor, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to Plaintiff Taylor's loan, the fixed and supracompetitive nature of the prices charged for title and settlement services, and his injuries and actual damages therefrom.

481.   As is reasonable under the circumstances, Plaintiff Taylor believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Plaintiff Taylor does not believe, that: (i) a coordinated business relationship exists between MBA and All Star, (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of his loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between MBA and All Star.

482.   Plaintiff Taylor acts diligently after his closing.  On or about December 14, 2018, Plaintiff Taylor receives a letter from undersigned counsel describing an investigation of All Star and MBA.  This is Plaintiff Taylor's first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to his MBA loan.

483.    Within days Plaintiff Taylor contacts and retains counsel.  Plaintiff Taylor files this Complaint within months of becoming aware of facts giving rise to his causes of action, injuries, and actual damages.

484.    As a result of the MBAs and All Star's fraudulent concealment, and Plaintiff Taylor's reasonable diligence before, during and after the closing of his loan, the statute of limitations related to Plaintiff Taylor's claims was tolled beginning on the date of his loan closing and continuing until Plaintiff Taylor's learning of facts giving rise to his causes of action, on or about December 14, 2018.

I.    **The Barth Plaintiffs' Reasonable Diligence**

485.    As a result of the fraudulent concealments by MBA and All Star, the Barth Plaintiffs have no actual notice before, at or after the closing of their MBA loan of the illegal kickbacks, the exchange of any thing of value between MBA and All Star, the Price Fixing and Minimum Fee Agreements, the resulting supracompetitive nature of the prices charged for title and settlement services, or the coordinated business relationship of MBA or All Star under the Kickback and Cartel Agreements.

486.    The Barth Plaintiffs exercise reasonable diligence before, during and after the closing of their loan.

487.    The Barth Plaintiffs receive loan documents prepared by MBA in advance of their closing and reviews those loan documents.  The Barth Plaintiffs' pre-closing loan documents include their "Good Faith" Estimate which they believe, and therefore aver, MBA prepared.  The Barth Plaintiffs' "Good Faith" Estimate does not include any description or statement of the coordinated business relationship between MBA and All Star, or the fact that All Star has paid anything of value for MBA's assignment and

referral of the Barth Plaintiffs' loan to All Star. *See* **Exhibit 138**, Barth Plaintiffs' "Good Faith" Estimate.

488.    The Barth Plaintiffs' "Good Faith" Estimate contains the fraudulent representations and omission described in ¶¶ 322-325 above.

489.    The Barth Plaintiffs' pre-closing documents reflect MBA and All Star's false allocation of fees, and, upon information and belief, contain a false APR as described in ¶¶ 309-319.

490.    The false statements and omissions made in the Barth Plaintiffs' pre-closing loan documents are made for the purposes of concealing, did so conceal from the Barth Plaintiffs, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature and amount of the illegal kickbacks related to the Barth Plaintiffs' loan, and the supracompetitive nature of prices charged them for title and settlement services.

491.    As is reasonable under the circumstances, the Barth Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Barth Plaintiffs do not believe, that: (i) a coordinated business relationship exists between MBA and All Star; (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of their MBA loan for title and settlement services, or (iii) the prices they will be charged for title and settlement services are fixed and supracompetitive, and the result of Kickback and Cartel Agreements between MBA and All Star.

492.    The Barth Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, MBA requires the Barth Plaintiffs to participate in a closing, and the Barth Plaintiffs attend and fully participate in the required closing.

493.    The Barth Plaintiffs believe, and therefore aver, that at the closing of their loan, they receive from All Star, or its agent, several documents, including a HUD-1 Settlement Statement.  The Barth Plaintiffs are not in possession of the documents received at their closing, including their HUD-1 issued regarding their MBA loan, and believe that document is in the sole possession of MBA.

494.    The Barth Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, do not contain a description or statement of the coordinated business relationship between MBA and All Star under any of the Kickback or Cartel Agreements.

495.    The Barth Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, does not contain a description or statement of any payment, amount or thing of value that was paid by All Star to MBA related to the Barth Plaintiffs' loan.

496.    The Barth Plaintiffs believe, and therefore aver, that the documents they receive at their closing, including their HUD-1, contain and reflect the false allocation of fees as described in ¶¶ 309-319.

497.    The Barth Plaintiffs believe, and therefore aver, that the documents they received at their closing, including their HUD-1, contain the false representations and omissions described in ¶¶ 326-331.

498.    The false representations and omissions in the Barth Plaintiffs' loan closing documents are made for the purposes of concealing, and did so conceal from them, the coordinated business relationship between MBA and All Star, the Kickback and Cartel Agreements, the fact, nature, and amount of the illegal kickback related to the Barth Plaintiffs' loan,

the fixed and supracompetitive nature of the prices charged for title and settlement services, and their injuries and actual damages therefrom.

499.    As is reasonable under the circumstances, the Barth Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Barth Plaintiffs do not believe, that: (i) a coordinated business relationship exists between MBA and All Star, (ii) there has been any payment or exchange of a thing of value between MBA and All Star related to the assignment and referral of their MBA loan for title and settlement services, or (iii) the prices charged for title and settlement services are fixed and supracompetitive and the result of Kickback and Cartel Agreements between MBA and All Star.

500.    The Barth Plaintiffs acts diligently after their closing.  On or about December 14, 2018, the Barth Plaintiffs receive a letter from undersigned counsel describing the describing an investigation of All Star and MBA.  This is the Barth Plaintiffs' first indication of any potential wrongful, illegal, potential harm and/or actionable conduct by anyone related to their MBA loan.

501.    Within days the Barth Plaintiffs contacts and retains counsel.  The Barth Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action, injuries, and actual damages.

502.    As a result of MBA and All Star's fraudulent concealment, and the Barth Plaintiffs' reasonable diligence before, during and after the closing of their loan, the statute of limitations on her claims were tolled beginning on the date of their loan closing and continuing until the Barth Plaintiffs' learning of facts giving rise to their causes of action, on or about December 14, 2018.

## VI.    Accrual and Tolling of Limitations

503.    The Barth Plaintiffs' claims pursuant to pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 accrued at the earliest, for the purpose of the limitations period provided in 15 U.SC. § 15(b), on the date of their injury, that is on or about February 25, 2015, the date their loan proceeds were disbursed and the Barth Plaintiffs incurred and paid the fixed and supracompetitive prices resulting from the Kickback and Cartel Agreements.  The Barth Plaintiffs' claims are brought within four years of that date, and are not subject to any limitations defense.

504.    In addition, Plaintiff Taylor's claims pursuant to pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 accrued at the earliest, for the purpose of the limitations period provided in 15 U.S.C. §15(b), on the date of his injury, that is on or about October 14, 2015, the date his loan proceeds were disbursed and Plaintiff Taylor incurred and paid the fixed and supracompetitive prices resulting from the Kickback and Cartel Agreements.  Plaintiff Taylor's claims are brought within four years of that date, and are not subject to any limitations defense.

505.    In addition, and in the alternative, the limitations period provided in 15 U.S.C. § 15(b), applicable to claims pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964**,** is subject to the discovery of injury rule.  *Detrick v. Panalpina,* 108 F.3d 529 (4th Cir. 1997) *cert. denied* 1997 U.S. Dist. LEXIS 4626.  MBA's affirmative acts precluded MBA borrowers, including all Plaintiffs and Class Members, from discovering the fixed and supracompetitive nature of the prices charged for title and settlement services, and affirmatively prevented MBA borrowers, including Plaintiffs and Class Members, from discovering the fact of their injuries resulting therefrom.

506.   As a result, Plaintiffs', and Class Members', claims pursuant to 15 U.S.C. § 1 and 18 U.S.C. § 1964 did not accrue, for the purpose of the limitations period provided in 15 U.S.C. § 15(b), until such time as Plaintiffs, and Class Members, knew, or should have known, of their injury – for the Remsnyder Plaintiffs, Strausbaugh, Leech Plaintiffs, Miller Plaintiffs, Vaughn, Geiling, and Doederlein Plaintiffs, on or about September 12, 2018, and for the Barth Plaintiffs and Taylor, on or about December 14, 2018.

507.   In addition and in the alternative, as a result of MBA's and All Star's fraudulent concealments and Plaintiffs' reasonable diligence before, during and after the closing of Plaintiffs' loans, the statute of limitations as to all causes of action pled herein are and should be tolled beginning on the date of each Plaintiffs' loan closing and continuing until the learning of facts giving rise to the causes of action pled herein: for the Remsnyder Plaintiffs, Strausbaugh, Leech Plaintiffs, Miller Plaintiffs, Vaughn, Geiling, and Doederlein Plaintiffs, on or about September 12, 2018, and for the Barth Plaintiffs and Taylor, on or about December 14, 2018.

508.   Plaintiffs believe, and therefore aver, that the fraudulent concealments described herein were an integral component of the Kickback and Cartel Agreements and the All Star Scheme, and typical of all alleged Class Members' transactions such that all Class Members are entitled to the equitable tolling of applicable limitations period.

## COUNT I
## Violation of the Real Estate Settlement Procedures Act (RESPA),
## 12 U.S.C. § 2607(a)

509.   Plaintiffs incorporate the above stated paragraphs as if restated herein.

510.   All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

511.    MBA laundered by and through its president, mortgage brokers, loan officers, employees and/or agents received and accepted things of value paid by All Star in exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a).

512.    All loans referred to All Star under the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by MBA and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

513.    The payment and/or arranging of payment of kickbacks to MBA by All Star and MBA's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

514.    Plaintiffs allege claims for violations of 12 U.S.C. § 2607(a) on their own behalf and pursuant to Fed. R. Civ. P. 23 with the class defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by MBA Mortgage Service, Inc. for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between July 1, 2009 and December 31, 2015. Exempted from this class is any person who, during the period of July 1, 2009 through December 31, 2015, was an employee, officer, member and/or agent of MBA Mortgage Services, Inc. or All Star Title, Inc.

> (the "RESPA Class").

515.    There are questions of law and fact common to the claims of each and all members of the RESPA Class. These common questions include, but are not limited to:

a.   Whether there existed a referral agreement between MBA and All Star whereby MBA agreed to assign and refer MBA loans, refinances and reverse mortgages to All Star in return for kickbacks;

b.   Whether MBA and its employees and/or agents received illegal kickbacks from All Star for the assignment and referral of business to All Star;

c.   Whether the illegal kickbacks to MBA and its employees and/or agents violated RESPA;

d.   Whether MBA and All Star used third party marketing companies to launder kickbacks related to MBA loans;

e.   Whether Plaintiffs and RESPA Class Members were forced to pay more for said settlement services;

f.   Whether MBA used sham and/or split invoices and sham payment records to actively and fraudulently conceal the payment, receipt and acceptance of illegal kickbacks;

g.   Whether MBA disclosed or described to any borrower its coordinated business relationship with All Star or the fact that a thing of value had been exchanged between MBA and All Star related to any borrower's loan;

h.   Whether MBA disclosed or described on any borrowers "Good Faith" Estimate, HUD-1 or other loan document MBA's coordinated business relationship with All Star or the fact that a thing of value had been exchanged between MBA and All Star related to any borrower's loan;

i.   Whether despite exercising reasonable due diligence, Plaintiffs and RESPA Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel;

    j.    Whether Plaintiffs and RESPA Class Members are entitled to treble damages under RESPA; and

    k.    Whether Plaintiffs and RESPA Class Members are entitled to attorneys' fees and expenses under RESPA.

516.    These common issues of law and fact predominate over any question affecting only individual RESPA Class Members.

517.    Plaintiffs' transactions and claims are typical of the claims or defenses of the respective RESPA Class Members, and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

518.    Plaintiffs will fairly and adequately protect the interests of the RESPA Class. The interests Plaintiffs and all other members of the RESPA Class are identical.

519.    Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in multiple U.S. District Courts in similar litigation, and will adequately represent the RESPA Class's interests.

520.    The RESPA Class consists of borrowers on more than 750 loans, and thus are so numerous that joinder of all members is impracticable.

521.    Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for MBA.

522.    This action entails questions of law and fact common to RESPA Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

523.    Most members of the RESPA Class are unaware of their rights to prosecute a claim against MBA.

524.    No member of the RESPA Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**COUNT II**
**Violation of the Sherman Act,**
**15 U.S.C. § 1**

525.    Plaintiffs incorporate the above stated paragraphs as if restated herein.

526.    All Star and MBA conspired to and executed an agreement to fix the price of title and settlement services charged to borrowers on refinances, reverse mortgages, and other mortgage loans, in violation of the Sherman Act, 15 U.S.C. § 1.

527.    As a direct and proximate result of the Cartel Agreements between MBA and All Star, Plaintiffs and Class Members were charged and paid supracompetitive prices for title and settlement services and were charged and paid more for title and settlement services than they otherwise would have without the Cartel Agreements.

528.    As a direct and proximate result of the Cartel Agreements between MBA and All Star, Plaintiffs and Class Members were injured and suffered actual damages in the amount of at least $300.00, which is the minimum difference between the lowest amount charged by All Star for settlement services with another lender and the amount charged to Plaintiffs under the Price Fixing and Minimum Fee Agreements with MBA and is the Kickback Overcharge.

529.    Plaintiffs allege claims pursuant to Fed. R. Civ. P. 23 for violations of 15 U.S.C. § 1 ("Antitrust Class"), with the alleged Antitrust Class defined as:

All individuals in the United States who were borrowers on a refinance, reverse mortgage, or other mortgage loan originated or brokered by MBA Mortgage Services, Inc. for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between July 1, 2009 and December 31, 2017.  Exempted from this class is any person who, during the period of July 1, 2009 through December 31, 2017, was an employee, officer, member and/or agent of MBA Mortgage Services, Inc. or All Star Title, Inc.

530.  The Antitrust Class consists of borrowers on more than 750 loans, and thus are so numerous that joinder of all members is impracticable.

531.  There are questions of law and fact common to the claims of each and all members of the Antitrust Class.  These common questions include, but are not limited to:

   a.  Whether MBA and its employees and/or agents violated the Sherman Act by conspiring to and fixing the title and settlement services fees charged to and paid by Plaintiffs and Antitrust Class Members;

   b.  Whether MBA and its employees and/or agents violated the Sherman Act by conspiring to and agreeing to supporting the Price Fixing and Minimum Fee Agreements through a concerted refusal to deal with non-cartel title and settlement service companies on all MBA loans generated by the Kickback Agreement;

   c.  Whether the prices charged MBA borrowers pursuant to the Cartel Agreements were supracompetitive, and higher than prices that would have been charged without the Cartel Agreements;

   d.  Whether MBA made false representations to borrowers to actively conceal the Cartel Agreements and supracompetitive prices resulting therefrom;

    e.   Whether All Star falsely allocated fees to actively conceal the Cartel Agreements and the supracompetitive prices charged MBA borrowers in performance of those agreements;

    f.   Whether MBA made false representations on MBA borrowers' Good Faith Estimates, HUD-1s and other loan documents to actively conceal the Cartel Agreements and the supracompetitive prices charged MBA borrowers in performance of those agreements;

    g.   Whether despite exercising reasonable due diligence, Plaintiffs and Class Members did not and could not have learned of the Cartel Agreements, the supracompetitive prices charged for title and settlement services, and their injuries and actual damages therefrom, until contacted by counsel;

    h.   Whether Plaintiffs and the Antitrust Class are entitled to treble damages under the Sherman Act; and

    i.   Whether Plaintiffs and the Antitrust Class are entitled to attorneys' fees and expenses under the Sherman Act.

532.   These common issues of law and fact predominate over any question affecting only individual Antitrust Class Members.

533.   Plaintiffs' transactions and claims are typical of the claims or defenses of the respective Antitrust Class Members, and are subject to the same statutory measure of damages set forth in 15 U.S.C. § 15(a).

534.   Plaintiffs will fairly and adequately protect the interests of the Antitrust Class. The interests of the named Plaintiffs and all other members of the Antitrust Class are identical.

535. Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the Antitrust Class's interests.

536. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for MBA.

537. This action entails questions of law and fact common to Antitrust Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

538. Most members of the Antitrust Class are unaware of their rights to prosecute a claim against MBA.

539. No member of the Antitrust Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

### COUNT III
### Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962

540. Plaintiffs incorporate the above stated paragraphs as if restated herein.

541. MBA is a "person" as defined under 18 U.S.C. § 1961(3).

542. The All Star Scheme constitutes an enterprise for the purposes of 18 U.S.C. § 1962(a). The activities of the All Star Scheme Enterprise affect interstate commerce across more than 30 states.

543. MBA and All Star perpetrated the All Star Scheme for the purpose of defrauding borrowers into paying fixed and supracompetitive prices for title and settlement services

related to MBA residential mortgage, refinance and reverse mortgages, and to thereby deprive borrowers of their money and/or property.

544.    The use of the U.S. Mail and interstate wires by MBA and All Star in furtherance of the All Star Scheme, as pled herein, constitutes a pattern of racketeering activity.

545.    MBA received, and continues to receive, income derived from this pattern of racketeering activity in the form of the kickbacks paid by All Star to MBA, and through the interest, fees and other income earned on the MBA mortgages, refinances and reverse mortgages resulting from the pattern of racketeering activity.

546.    MBA improperly used and invested the income it received from the pattern of racketeering activity in furtherance of the All Star Scheme Enterprise and for the purpose of luring borrowers into the All Star Scheme Enterprise in violation of 18 U.S.C. § 1962.

547.    As a direct and proximate result of MBA's pattern of racketeering activity, Plaintiffs and Class Members were injured and suffered actual damages in the amount of at least $300.00, which is the minimum difference between the lowest amount charged by All Star for settlement services with another lender and the amount charged to Plaintiffs under the Price Fixing and Minimum Fee Agreements with MBA and is the Kickback Overcharge.

548.    Plaintiffs allege claims pursuant to Fed. R. Civ. P. 23 for violations of 18 U.S.C. § 1962(a) ("RICO Class"), with the alleged RICO Class defined as:

> All individuals in the United States who were borrowers on a refinance, reverse mortgage, or other mortgage loan originated or brokered by MBA Mortgage Services, Inc. for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between July 1, 2009 and December 31, 2017. Exempted from this class is any person who, during the period of July 1, 2009 through December 31, 2017, was an employee, officer, member and/or agent of MBA Mortgage Services, Inc. or All Star Title, Inc.

549.  The RICO Class consists of borrowers on more than 750 loans, and thus are so numerous that joinder of all members is impracticable.

550.  There are questions of law and fact common to the claims of each and all members of the RICO Class.  These common questions include, but are not limited to:

    a.  Whether MBA and its employees and/or agents violated RICO by defrauding borrowers, including Plaintiffs and RICO Class Members, into paying supracompetitive prices for title and settlement services and fund the kickbacks All Star is paying MBA;

    b.  Whether MBA and All Star formed an enterprise;

    c.  Whether the activities of the All Star Scheme Enterprise affected interstate commerce;

    d.  Whether one purpose of the All Star Scheme was to deprive borrowers of money or property;

    e.  Whether MBA and All Star used the interstate U.S. Mail in furtherance of the All Star Scheme and All Star Scheme Enterprise;

    f.  Whether MBA and All Star used the interstate wires in furtherance of the All Star Scheme and the All Star Scheme Enterprise;

    g.  Whether MBA received income from a pattern of racketeering activity;

    h.  Whether MBA used income derived from a patter of racketeering activity in support of, or in furtherance of, the All Star Scheme Enterprise;

    i.  Whether MBA actively conceals the All Star Scheme, the supracompetitive prices and the All Star Scheme Enterprise;

j. Whether Plaintiffs and RICO Class members knew or should have known of their injuries resulting from MBA's violation of 18 U.S.C. § 1962(a);

k. Whether MBA and All Star's fraudulent concealments prevented Plaintiffs' and RICO class members from discovering their injuries proximately caused by the MBA's pattern of racketeering activity;

l. Whether Plaintiffs and the RICO Class are entitled to treble damages pursuant to 18 U.S.C. § 1964(c); and

m. Whether Plaintiffs and the RICO Class are entitled to attorneys' fees and expenses pursuant to 18 U.S.C. § 1964(c).

551. These common issues of law and fact predominate over any question affecting only individual Racketeering Class Members.

552. Plaintiffs' transaction and claims are typical of the claims or defenses of the respective Racketeering Class Members, and are subject to the same statutory measure of damages set forth in 18 U.S.C. § 1964(c).

553. Plaintiffs will fairly and adequately protect the interests of the RICO Class. The interests of the named Plaintiffs and all other members of the RICO Class are identical.

554. Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the RICO Class's interests.

555. Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for MBA.

556. This action entails questions of law and fact common to RICO Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class

action is superior to other available methods of fair and efficient adjudication of this litigation.

557. Most members of the RICO Class are unaware of their rights to prosecute a claim against MBA.

558. No member of the RICO Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**WHEREFORE**, Plaintiffs respectfully demand:

a. This Court to certify the RESPA, Antitrust, and Racketeering Classes pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial;

b. Judgment for Plaintiffs and RESPA Members against MBA Mortgage Services, Inc., and award Plaintiffs and RESPA Class Members treble damages for title and settlement services charged by All Star, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

c. Judgment for Plaintiffs and Antitrust Class Members against MBA Mortgage Services, Inc., and award Plaintiffs and Antitrust Class Members damages in the amount equal to three times the actual damages caused by the Cartel Agreements pursuant to 15 U.S.C. § 15(a);

d. Judgment for Plaintiffs and RICO Class Members against MBA Mortgage Services, Inc., and award Plaintiffs and RICO Class Members damages in the amount equal to three times the actual damages caused by the All Star Scheme pursuant to 18 U.S.C. § 1964(c);

e.  Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5), 15 U.S.C. § 15(a), and 18 U.S.C. § 1964(c); and

f.  For such other and further relief as this Court deems proper.

Respectfully submitted,

_____/s/_____          _____/s/_____
Timothy F. Maloney, Esq. #03381          Michael Paul Smith, Esq. #23685
Veronica B. Nannis, Esq. #15679          Melissa L. English, Esq. #19864
Megan A. Benevento, Esq. #19883          Sarah A. Zadrozny, Esq. #13911
Joseph, Greenwald & Laake, P.A.          Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400          600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770          Towson, Maryland 21204
(301) 220-2200 / (301) 220-1214 (fax)          (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com          Email: mpsmith@sgs-law.com
vnannis@jgllaw.com          menglish@sgs-law.com
mbenevento@jgllaw.com          szadrozny@sgs-law.com
*Co-Counsel for Plaintiffs and Class Members*          *Counsel for Plaintiffs and Class Members*

## PRAYER FOR JURY TRIAL

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action Complaint.

_____/s/_____          _____/s/_____
Timothy F. Maloney, Esq. #03381          Michael Paul Smith, Esq. #23685
Veronica B. Nannis, Esq. #15679          Melissa L. English, Esq. #19864
Megan A. Benevento, Esq. #19883          Sarah A. Zadrozny, Esq. #13911
Joseph, Greenwald & Laake, P.A.          Smith, Gildea & Schmidt, LLC
6404 Ivy Lane, Suite 400          600 Washington Avenue, Suite 200
Greenbelt, Maryland 20770          Towson, Maryland 21204
(301) 220-2200 / (301) 220-1214 (fax)          (410) 821-0070 / (410) 821-0071 (fax)
Email: tmaloney@jgllaw.com          Email: mpsmith@sgs-law.com
vnannis@jgllaw.com          menglish@sgs-law.com
mbenevento@jgllaw.com          szadrozny@sgs-law.com
*Co-Counsel for Plaintiffs and Class Members*          *Counsel for Plaintiffs and Class Members*